Argued and submitted November 4, 1999, reversed with instructions in part; otherwise affirmed May 3, appellant's petition for reconsideration filed May 31 allowed by opinion September 13, 2000
See 169 Or App 606 (2000)

In the Matter of
Trebin Jenkis, a Minor Child.

STATE ex rel JUVENILE DEPARTMENT
OF MULTNOMAH COUNTY,
*Appellant,*

*v.*

Mysta PROCTOR
and Brandon Jenkis,
*Respondents.*

(9607-81949; CA A105270)

2 P3d 405

Laura S. Anderson, Assistant Attorney General, argued the cause for appellant. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Kathryn Worden Underhill filed the brief for child.

Peter Miller argued the cause and filed the brief for respondent Mysta Proctor.

No appearance for respondent Brandon Jenkis.

Before Linder, Presiding Judge, and Deits, Chief Judge, and Kistler, Judge.

DEITS, C. J.

## DEITS, C. J.

■ The state appeals the trial court's dismissal of the state's petition to terminate the parental rights of mother and father. We review *de novo*, ORS 419A.200(5), to determine whether clear and convincing evidence supports the petition for termination. We affirm with respect to mother and reverse as to father.

Mother and father never married. Child was born April 2, 1996. On the morning of July 2, 1996, child, who was then three-and-one-half months old, was admitted to Oregon Health Sciences University (OHSU) after mother and father noticed that his head was swollen. They told the hospital staff that they believed that the swelling was caused by the circumstances of child's traumatic birth. Although, at first, the doctors indicated that birth trauma was one possible cause of child's condition, they soon concluded that the injuries were nonaccidental. Dr. Zenel, a pediatrician trained in evaluating child abuse injuries and child's primary pediatrician since July 1996, testified that he believed with "medical certainty" that the injuries were nonaccidental, "that this child was battered and on more than one occasion. Battered and shaken." Ultimately, the doctors determined that child's skull was fractured on both sides, that the fractures were very recent, most likely occurring within 24 hours of child's initial examination at OHSU, and that they were direct impact fractures caused by extremely forceful blows to both sides of the child's head. The child also had injuries consistent with having been violently shaken on at least one, and possibly two, occasions two to six weeks before the occurrence of the skull fractures. Dr. Zenel also testified that "[t]here was a bruise underneath [child's] tongue over the anterior salivary gland which would indicate some forceful jabbing or something being pushed hard against the area underneath the tongue."

Mother and father were informed of the diagnosis of multiple incidents of nonaccidental trauma. However, even after that, both mother and father continued to assert that

child's condition was the result of birth trauma[1] or of an incident that occurred a day or two before his admission to the hospital, in which a screen door hit his head as mother carried him into the house. Dr. Zenel did consider the screen door as a possible cause of child's injuries. He testified that that incident could only have caused one of the fractures and, even then, it would depend on the type of screen door. Officer Johnson, a Portland police officer assigned at that time to a child abuse team, testified that he went to mother and father's home and examined the screen door. He described it as a "lightweight aluminum structure" with "no return spring * * * but up at the top there was, like, a plastic, elastic used to keep the door from opening all the way or slamming probably against the side of the house." Dr. Zenel testified further that the only accidental trauma he could think of that would cause the type of fractures that child had "would be a situation that, if the child's [lying] on the floor head to the side, and some heavy object falls on top of the head, which would pin the head between the falling object and the hard floor" or "a high speed car accident in which the child is thrown forward, caught between doors slamming or hitting against, getting thrown both—several directions as the car hits impact."

Mother and father have been consistent in their description of the events on the day before child's admission to the hospital. They reported that the three of them, mother, father, and child, were together the entire day except for a short period of less than an hour, during which mother went with a friend, Marie Lange, to get ice cream. Lange testified at the hearing. She said that before they left, child appeared sleepy but that she did not notice anything wrong with him at that time. While mother and Lange were gone, father remained at home alone with child. Father testified that while mother was gone, he picked child up off of the couch where child was sleeping and tucked him into his crib in another room. Mother testified that when she returned from getting ice cream, child was in bed, and because she did not want to wake him, she did not see him until the following

---

[1] Father testified that they had been concerned about child's head size and shape since birth and that they had asked questions about these issues at child's check-ups. There is no medical evidence in the record to support this claim.

morning.[2] At that time, she noticed that child's head was severely swollen.

When child was released from the hospital, he was placed in a medical foster home. At the time of trial, child was two-and-one-half years old and was still in the same foster home. Initially, after child was placed in the foster home, mother had weekly one-and-one-half to two-hour supervised visits with child at the State Office for Services to Children and Families (SOSCF). In December 1996, when mother moved to Vancouver, her visits changed to weekend visits of approximately five hours, supervised by her ex-mother-in-law, with whom she lived. In addition, child's foster mother testified that, in the first year and a half that she cared for child, he had 20 doctor's appointments and that mother attended all but one. Child's half-brother (S) has been present for most of mother's visits with child. Apparently, the two boys have bonded and developed "a very close relationship."

Mother and father signed a service agreement with SOSCF on September 17, 1996. Under that agreement, they agreed to:

"1.   Complete [Volunteers of America] parenting classes
"2.   Obtain psychological evaluations and follow all recommendations
"3.   Attend all scheduled visits
"4.   Participate actively in the child's medical treatment
"5.   Keep SCF informed of their current address and phone number[.]"

Mother underwent two separate psychological evaluations that were required by the service agreement. The first evaluation took place in September of 1996. The psychologist who evaluated mother, Dr. Kelleher, concluded that:

"[S]he was a woman who was very attached to her children and very concerned about her children and her parenting, that she showed strong perfectionistic tendencies but was very reluctant—and that these tendencies made her very reluctant to acknowledge any difficult—any difficulties

---

[2] Lange, however, testified that mother did go into child's room upon their return and stayed in there for 10 or 15 minutes.

with her or with her family members. She wanted to be the perfect parent.

"She had some failures of insight and clearly demonstrated unresolved and very—still very painful emotional issues from childhood. She also demonstrated submissive attitude in many ways in relation to [father] and a tendency to have emotional outbursts both of anger and of grief."

Kelleher noted that mother

"thought that the bump on the head by the screen door * * * had jostled something and not injured the child but actually stimulated a growth spurt where he began to develop more normally; whereas, before, he had been a more lethargic baby and slow to gain, thrive baby."

Kelleher recommended that mother participate in both individual and couples counseling. In particular, she specified that long-term individual psychotherapy would be most beneficial in helping mother "discern her needs versus her child's needs" and to successfully implement the parenting skills that she already had.

The second psychological evaluation of mother, done by Dr. Deitch, occurred in September 1997. The results of that evaluation are unclear from the record. A summary report to the court dated November 17, 1997, stated that "Dr. Deitch recommended that the parents continue their individual and marital counseling, and that a contract be set up with the family if [child is] to be transitioned home."

In addition, under the service agreement with SOSCF, mother attended a series of parenting classes, held over a six-month period. The instructor of the classes reported that despite being angry and defensive about being required to take the classes,[3] mother attended and actively participated in all of them. The instructor testified that mother "was receptive to feedback, that she asked questions, that she seemed interested in the material, open to new ideas."

---

[3] According to the instructor, this was a common reaction of participants in the program.

Mother and father were also required to attend family counseling. At their first session, the counselor administered a test to evaluate their relationship and determine if they wanted to make any changes. The counselor testified that

> "[t]he result was that the couple felt that they liked things pretty much the way they were and they wanted to pretty much keep things the way they were. As a result of that it was decided not to meet initially doing couples counseling, 'cause there wasn't anything to work on.' "

Mother and father later returned to the same therapist and underwent counseling for about four months, until they separated.

In December 1997, mother left father and moved in with her ex-mother-in-law. She testified that she left father because she was no longer happy and she no longer felt safe with him. Mother also testified that while they were living together, father had been overly controlling and had physically abused her on a number of occasions. Mother described some of the abuse, including: an incident in which father pushed her down stairs and then came down after her and shoved her to the ground so that she hit her head and "saw stars"; an incident when father pushed her through the plateglass window of a restaurant because he had not liked the answers she had given at a psychological evaluation; and various incidents in which he shoved, grabbed and shook her in order to "calm her down." In addition, mother reported that father controlled her usage of their telephone, required her to account for how she spent her time while he was at work, and sometimes didn't allow her to use the bathroom at night, even while she was pregnant.

Child's foster mother testified that she noticed significant changes in mother after the separation from father:

> "Oh, she's—her self-esteem seems to be much better. She's more positive. She's working now and feels that she can do a really good job. Before she felt that she was a dummy and that nobody would hire her and that they were all looking at her like she was a terrible person. She would tell me that. She says these people think I'm terrible, that I

did something to my son when I didn't, and that they all think I'm a dummy. She used to say 'dummy' quite a bit.

"And she's just more positive. She can do things now and she has goals, things she wants to do with her life. We don't talk about it a lot, but she's a lot happier, smiles a lot more."

Robin Laws, mother's therapist at the time of trial, whom mother had been seeing since November 1997, testified that mother was making progress in her struggle to gain insight into what had happened to child and to deal with her responsibility for child's injuries. After approximately one-and-one-half years of therapy, mother finally began to acknowledge the domestic violence present in her relationship with father and also began "seeing things differently" with respect to the possibility that father had caused child's injuries. Laws testified that "[mother] realized * * * that perhaps if [father] could intimidate her, someone who could speak up for herself, that he might do that with someone small." At trial, mother estimated that there was about a 50/50 chance that father had been the cause of child's injuries, but she also testified that she still believed that the circumstances of child's birth had contributed to, if not caused, the injuries.

Mother has another son, S, who was born on March 12, 1992. Although SOSCF investigated an incident when S was three months old, no action was taken. During the proceedings here, the court ordered SOSCF to investigate the health and safety of S while in mother's care and to provide that information to the parties in this case. The record here does not indicate the results of that investigation. Child's foster mother testified about her observations of mother's interaction with S during mother's visits with child:

"She's always quite appropriate with him. Tries to pay a lot of attention to him, but she does tell him sometimes that he needs to wait, that this is [child's] time, and she will spend time with him later. Never any yelling at him or threaten to hit him or anything. She never does anything like that. And tries to involve both the boys."

The rights of a parent may be terminated if the court finds that the parent is unfit by reason of conduct or condition

seriously detrimental to the child and that reintegration of the child into a home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change. ORS 419B.504. If the state proves the above factors by clear and convincing evidence, ORS 419B.521, the second stage of the determination focuses on whether the best interests of the child will be served by the termination of parental rights.

Here, the trial court found that the state had clearly proved allegation 3(A)(1) with respect to both parents. That allegation stated:

> "The child was seriously physically abused while in the parents' care. At three months old, the child was diagnosed with nonaccidental injuries of two bilateral skull fractures, old and new subdural hematomas, and bruising on the back of the child's head, ear, and tongue. The parents have no reasonable explanation for these injuries."

The court went on to find, however, that although the state had proved that father had not made any "identifiable lasting progress in his ability to provide adequate care to the child," the state had failed to show clearly and convincingly that mother had not made progress in her ability to care for child. In addition, the trial court was "not convinced by clear and convincing evidence that the return of the child to the mother is improbable within a reasonable time due to conduct and conditions not likely to change." Consequently, the court dismissed the petition to terminate the parental rights of both parents. The court explained that although there were grounds for terminating father's parental rights, the court was dismissing the petition as to father because it was not terminating mother's rights.

■■ On appeal, the state assigns error to the court's decision not to terminate both mother's and father's parental rights. ORS 419B.504 sets out a number of factors that the court should consider in determining whether the state has proven that a parent is unfit under the statute and whether the parent's unfitness is likely to change. Two of the factors are pertinent here:

> "(2) Conduct toward any child of an abusive, cruel or sexual nature.

"* * * * *

"(5)  Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make the return of the child possible or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

Although our review of this material is *de novo*, we give "considerable weight" to the trial court's findings on credibility due to that court's ability to "observe the witnesses and their demeanor." *State ex rel Juv. Dept. v. Geist,* 310 Or 176, 194, 796 P2d 1193 (1990). As the trial court found, there is no question that serious abuse of this child took place while the child was in mother's and father's care and custody. However, as mother's counsel recognizes in her brief, the central issue regarding whether mother's rights should be terminated "is mother's ability to change her condition or circumstance and benefit from the services provided her * * * in order to provide a safe and at least minimally adequate home for her son." We agree with the trial court that mother may have the ability to change her circumstances in a way that will allow her to provide adequate care for her child within a reasonable time.

The evidence clearly shows that mother has complied with all requirements placed on her by SOSCF. Betsy Pierson, the caseworker assigned to this case from July 1996 to January 1997, testified that while she had the case, mother signed a service agreement, attended parenting classes, visited child regularly, participated in a psychological evaluation, attended child's medical appointments and made efforts to locate a licensed therapist that she could afford.

The state is correct that "it is not enough to merely attend classes or walk through programs." *See State ex rel SOSCF v. Frazier,* 152 Or App 568, 598, 955 P2d 272, *rev den* 327 Or 305 (1998). However, the record here supports mother's contention that she has actively participated in everything that SOSCF has required of her and that she also has made adjustments in her life that increase the likelihood

that, in a reasonable time, she will be able to provide a safe and healthy home for child. At the time of trial, mother had broken off her abusive and controlling relationship with father and was living in a supportive environment. She had maintained steady employment for nine months, had developed a therapeutic relationship with her counselor resulting in her recognition of past involvement in abusive relationships, and she had consistently given priority to achieving reunification with child.

The most serious and troubling aspect of mother's behavior is her minimization and denial of any responsibility of her or father for the very serious injuries that occurred to her child. The state argues that:

"The evidence was clear and convincing that from the time [child] was injured at the age of three months, mother has been unable or unwilling to accept the truth about his injuries and her own responsibility for them, whether as an abuser or a parent who failed to protect her child. Mother continues to equivocate about the cause of the injuries. So long as mother denies or minimizes the fact of [child's] abuse, he remains at risk for additional abuse if he is returned to her care. Although after two and a half years, mother can now vaguely articulate the possibility that father perpetrated the abuse, she maintains her baseless conviction that the child was injured at birth."

The state's point is well taken and makes this case a very close one with respect to mother. Mother's progress in dealing directly with the cause of the injuries to her child has been minimal. However, the record shows that, since she has separated from father and removed herself from his influence, she has made progress in acknowledging that problem. Both mother's testimony and the testimony of Laws support that conclusion. The evidence indicates that as mother's understanding of the nature of the abusive relationship that existed between herself and father grew, she also began to accept the fact that child suffered serious nonaccidental injuries while in her care. As mother testified:

"Q. What do you believe caused the bilateral fractures of his skull, the two bilateral fractures?

"A. Well, for a long time I thought it was the forceps. You know, I wasn't really conscious for all that, and so—

"Q. What do you mean you weren't conscious for all what?

"A. For his birth.

"Q. Okay, okay. And so for a long time you thought it was the forceps from the birth?

"A. Yes.

"Q. And is that still what you believe today?

"A. To some extent, yes.

"Q. To what other extent is there? What does that mean, 'to some extent'?

"A. Well, I think that—that something happened after the fact. I don't know what happened after that. So I can't say, you know, what happened. I don't know what happened."

■■ As we have said before, under some circumstances, parents who have begun to make progress may be "entitled to a chance to show that it is permanent." *State ex rel Juv. Dept. v. Wyatt,* 34 Or App 793, 798, 579 P2d 889, *rev den* 283 Or 503 (1978), *quoted in State ex rel SOSCF v. Armijo,* 151 Or App 666, 684, 950 P2d 357 (1997); *see also State ex rel Juv. Dept. v. Pennington,* 104 Or App 194, 199, 799 P2d 694 (1990), *rev den* 311 Or 166 (1991) (reversing termination where mother's attitude and conduct changed "from denial to recognition that she need[ed] help to provide proper care for her children"). The standard of "clear and convincing" evidence requires a showing that it is highly probable that mother is not presently able, and will not be able within a reasonable time, to protect child and to meet child's physical and emotional needs. *See State ex rel Juv. Dept. v. Johnson,* 165 Or App 147, 997 P2d 231 (2000). Here, as in *Armijo,* "we do not believe that [the] record shows, by clear and convincing evidence, that mother will *not* succeed, thus, rendering reunification 'improbable.'" Given mother's commitment to child, her undeniable determination to improve her parenting skills, her compliance with every condition set by SOSCF, and, in particular, her progress since her separation from father, we conclude that the trial court was correct and that

mother's parental rights should not be terminated at this time. As we have noted in other cases, SOSCF continues to exercise jurisdiction and may take appropriate action if mother's separation from father proves temporary or if mother's denial continues for an unreasonable period despite the absence of father's controlling influence.

■     With respect to father, we agree with the trial court's finding that the state proved by clear and convincing evidence that allegation 3(A)(4)(b) is true. That allegation stated that:

> "Since September of 1996, the father has been offered and provided with assistance from the State Office for Services to Children and Families, including but not limited to, psychological evaluations, individual counseling, marital counseling, Intensive Family Services, parenting classes, and visitation, without identifiable lasting progress in his ability to provide adequate care to the child."

In 1996, father signed the same service agreement as mother, agreeing to parenting classes, psychological evaluation and treatment, attendance at scheduled visits, active participation in child's medical treatment, and continued contact with SOSCF. Father attended parenting classes with mother. The instructor reported that, although the classes were not a substitute for psychological counseling, father seemed to benefit from what the classes had to offer.

Father also was evaluated by Kelleher, who testified that at the time that she evaluated him

> "the defensiveness that he demonstrated that he could have had any input at all into what happened with his—with his child, that he could in any way have created the difficulties that he talked about, that he could in any way be responsible for igniting anger in another person or displaying anger outside of his awareness, all of those things really increased the probability that—that he could have episodic outbursts that he either remembered and didn't report or didn't remember.
>
> "He was very, very adamantly opposed to looking at any potential that he might have any violent impulses at all."

Having read a more recent evaluation of father, Kelleher also gave her opinion with respect to his progress:

"At the time I saw him I believed that he did need anger management. At the—I reviewed Dr. [Deitch's] report, which is more current, and I would—I would think that, on the basis of that report, that the need for anger management remains, that those issues are not resolved in the present."

Kelleher identified father's issues as "characterological." She testified that

"[i]t means that they—that the symptoms, the behaviors, the style of dealing with the world is pervasive and ingrained and long-term, deeply a part of the way he operates and perceives the world.

"That means that *they're very resistant to change* and mostly because they—they act to keep him emotionally comfortable on some level so they're very resistant to change. And the only way that change—that tends to change is long-term intensive psychotherapy over many years." (Emphasis added.)

Father began individual psychological counseling with Deborah Bensching in February 1997. She believed that among the issues that father needed to address was his ability to manage his anger. Father, testified that, although he had signed a service agreement that required him to follow all recommendations resulting from his psychological evaluation, he had not seen his counselor in three months. He also stated that he did not think that anger management was an issue that he needed to address and that he felt he had resolved the issues for which he had been in therapy. Bensching, however, testified that these issues had *not* been resolved at the time that father discontinued treatment. She stated that he still needed to work on issues related to anger management, family of origin, domestic violence, and child protection.

Father has consistently attended his scheduled visits with child, since January 1998. The SOSCF supervisor for those visits reported that father and child appeared to be bonded and that father exhibited appropriate behavior during the visits. However, child's foster mother reported that, although she informed him of the dates and times, father attended only the first three or four of child's approximately

20 medical appointments. In addition, father missed an appointment with child's genetic specialist for genetic testing with respect to child's diagnosis of Saethre-Chotzen syndrome.[4] Because father may himself have Saethre-Chotzen syndrome, the specialist requested that he be evaluated in order to "provide an additional dimension of information in order to support [child's] diagnosis."

Although father described his relationship with mother as "[w]onderful, excellent, loved her dearly," by all other reports, their relationship was often troubled and violent. Father acknowledged that they had arguments that at times elevated into physical altercations. As noted above, in separate instances, father pushed mother down a flight of stairs, onto the ground, and through a plate-glass window. Numerous witnesses commented on the level of control that father exerted on mother. Evidence at trial indicated that father's control extended to mother's statements during psychological evaluations and during parenting classes. Dr. Kelleher testified that:

"He was extremely controlling and manipulative, emotionally manipulative.

"* * * * *

"He would interrupt—when they were together talking to me, he would interrupt her attempt to tell an emotional story that she was trying to tell because he disagreed with the factual information that she offered.

"She would continue—she made repeated attempts to continue with her version even telling him, you know, that's how he remembered it, but this was how she remembered it and with—every time he would interrupt her, she would, like, slump more deeply into the chair and eventually gave up her efforts at all.

"It was only after that capitulation that—where she completely shut down and offered no verbal—or just quit trying to talk or trying to tell the story, and at that point, after she did that, he would become protective and reach over and try—attempt to, like, reassure her.

---

[1] The evidence indicates that, while Saethre-Chotzen syndrome does involve skull malformation, it would not have affected the skull injuries child suffered at three months.

"\* \* \* \* \*

"She'd say 'you're right, I'm wrong,' even though she obviously didn't believe it and had said so."

During their parenting classes, the instructor urged mother and father to sit apart from each other because "they were acting as a unit" and father was "sort of taking a leadership role \* \* \* being very interested in [mother's] work and what she was doing." Although mother indicated that she was willing to sit apart from father, father was very opposed and "seemed to make a decision for both of them by saying we will not do that."

We also find it significant that, despite the doctors' certain conclusion that child's injuries were nonaccidental, father continues to adamantly deny any responsibility for them. That fact taken together with father's view, manifested by both his statements and his conduct, that he does not need to improve his anger management or parenting skills and that the majority of his problems are not caused by his own actions but by how others "perceive" him, cause us to conclude, as did the trial court, that the evidence here is clear and convincing that father is presently unfit by reason of conduct or condition seriously detrimental to child and that reintegration of child into father's home is improbable within a reasonable time. As noted above, however, the trial court did not terminate father's parental rights because the court determined that "[g]iven the findings as to the mother, the court does not believe that it is in the best interest of the child to terminate the rights of the father \* \* \*."

In view of our conclusion that the record establishes that father is presently unfit by reason of conduct and condition that are seriously detrimental to child and that those conditions are not likely to change, we fail to understand how it is in child's best interest not to terminate father's rights. According to the record before us, mother and father are separated and no longer have a relationship and, therefore, this is not a situation where father will be in the home if his rights are terminated.

We recognize that the state has taken the position before this court that if one parent's rights are not terminated, the state generally does not request that the other parent's rights be terminated. The state has informed the court that its position is based on agency policy. However, the state has not provided this court with any further information regarding the specifics of that policy or the rationale underlying it. On the other hand, on appeal, child contends that the court *should* terminate father's parental rights even if the court decides not to terminate mother's rights. Child relies on ORS 419B.500 to support his argument. That statute provides that "[t]he rights of one parent may be terminated without affecting the rights of the other parent."

Our obligation in reviewing this matter is to apply the legal standards for termination articulated in the statutes. Here, there is clear and convincing evidence that father is unfit under the standards of ORS 419B.504. Further, no reason is offered by any party before this court why it is not in child's best interests for father's parental rights to be terminated. We conclude that father's parental rights should be terminated and, accordingly, the trial court erred in failing to terminate his rights.

Reversed with instructions to terminate father's parental rights; otherwise affirmed.