Argued and submitted September 15, 2006, reversed and remanded
February 28, 2007

In the Matter of
B. G. W., a Minor Child.

STATE ex rel DEPARTMENT OF
HUMAN SERVICES
*Respondent,*

*v.*

L. S.
and J. L. W.,
aka J. L. S.,
*Appellants.*

02-668J; A131658
(Control)

In the Matter of
A. L. W., a Minor Child.

STATE ex rel DEPARTMENT OF
HUMAN SERVICES,
*Respondent,*

*v.*

J. L. W.,
aka J. L. S.,
*Appellant.*

02-667J; A131775
(Cases Consolidated)

154 P3d 148

Inge D. Wells argued the cause for appellant L. S. With her on the brief was Wells & Wells.

Daphne E. Mantis argued the cause and filed the brief for appellant J. L. W.

Laura S. Anderson, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Schuman* and Ortega, Judges.

* Schuman, J., *vice* Ceniceros, S. J.

ORTEGA, J.

### ORTEGA, J.

Mother appeals the termination of her parental rights to her two children, A and B. Father appeals the termination of his parental rights to B.[1] We review *de novo*, giving weight to the credibility findings of the juvenile court. ORS 419A.200(6); *State ex rel Juv. Dept. v. Proctor*, 167 Or App 18, 27, 2 P3d 405, *adh'd to on recons*, 169 Or App 606, 10 P3d 332 (2000). Because there is insufficient evidence that either mother or father was unfit at the time of trial, we reverse and remand.

The pertinent facts in this case occurred over a period of several years, from 2002 to November 2005, when the trial took place. We begin with a brief overview of the family relationships and the initial involvement of the Department of Human Services (DHS) with the family. We then examine mother's drug use and participation in treatment programs. Finally, we turn to father's participation in drug and alcohol and domestic violence treatment programs and the psychological evaluations of father.

Mother's older child, A, was born in April 2001. Mother and father were married in February 2002, about nine months before the birth of their child, B. After the marriage, mother, father, and A lived with mother's parents. In April 2002, mother obtained a Family Abuse Prevention Act (FAPA) restraining order against father, based on allegations that he was "a very angry person," made verbal threats, sometimes shoved or physically restrained her, and caused her to fear for her life and A's life. Father acknowledged saying "very hurtful things" but denied the other allegations of mother's FAPA petition. Father moved out of the household, and mother and A remained with mother's parents.

In late June 2002, a police officer found methamphetamine and pipes in a car in which mother was a passenger. Mother, who was five months pregnant with B, eventually admitted that the methamphetamine was hers, although she claimed that she was selling it and that she had not used

---

[1] A's father reportedly relinquished his parental rights and is not a party to this appeal.

methamphetamine for several months. She later pleaded guilty to unlawful possession of a controlled substance. In the final month of her pregnancy, mother had a urinalysis test (UA) that was positive for methamphetamine.

B was born in November 2002, and mother then withdrew her restraining order against father. Shortly after B's birth, mother had another positive UA, and DHS filed petitions invoking juvenile court jurisdiction. After a shelter hearing, the juvenile court placed A and B in the physical custody of mother, on the condition that mother live with her mother (grandmother), take UAs as requested, and participate in drug assessment and treatment. Father had visitation as authorized by DHS.

In December 2002, Pitcher, a DHS caseworker, convened a family decision meeting with mother and grandmother, which father did not attend. The plan that they developed required mother to complete a drug and alcohol assessment and to provide UAs. Later that month, when Pitcher met with father to discuss a service plan, he accused DHS of placing video cameras at his home. At trial, father maintained that a neighbor had informed him that the state had placed cameras outside his home. Father had not checked for cameras, but believed the neighbor.

In January 2003, the juvenile court took jurisdiction over both children. The court ordered mother to participate in a psychological evaluation, to follow all resulting recommendations, and to address concerns about domestic violence and substance abuse. Father was ordered to participate in a psychological examination, to follow all resulting recommendations, and to complete an approved domestic violence program.

Mother and father ended their relationship sometime in 2003. Father blamed their break-up, at least in part, on pressures caused by DHS. At the time of trial, mother and father had not yet divorced, purportedly for financial reasons. The children have lived at grandmother's house their entire lives.

We turn to the evidence regarding mother's drug use and her participation in various services. DHS referred

mother to Prevention and Recovery Northwest for drug treatment from late 2002 to early 2003. Mother did not think that she needed treatment and told her drug and alcohol counselor, Beck, that she had used methamphetamine only twice in her life. Mother also told Beck that she had no history of physical abuse. During the time that Beck worked with mother, she did well in some respects but did not make progress in overcoming her denial. Still, mother thought she had done well in the program.

In February 2003, Dr. Sweet performed a psychological evaluation of mother. Sweet opined that mother was defensive, minimized problems, and thus was unlikely to benefit from services. He was concerned, for example, that mother reported that she had adequately addressed domestic violence concerns in a single one and one-half hour session. He diagnosed mother with low cognitive abilities and an adjustment disorder with depressed mood. Sweet thought that more examination was needed regarding whether mother suffered from a depressive disorder, alcohol or drug problems, and a personality disorder not otherwise specified, with characteristics of dependent and passive-aggressive personality disorders. He found mother difficult to diagnose clearly because she was so defensive.

In July 2003, mother and the two children were in a rollover car accident. The children were in car seats and were not injured. However, mother tested positive for marijuana and amphetamine and admits that she was under the influence of amphetamine at the time of the accident. She was not cited for any criminal charges arising from the incident.

DHS removed the children from mother's care and placed them in grandmother's custody, where they have remained ever since. After mother was released from the hospital, she moved back in with grandmother. After spending a month recovering from her injuries, she moved out of grandmother's home and lived with father for about two weeks. After that, she moved in with her new significant other, Anderson, whom she had met some years earlier and with whom she had recently become reacquainted.

In mid-August and September 2003, mother had two positive UAs for methamphetamine. In late October, she was

admitted to an in-patient treatment program at Willamette Family Treatment Services (WFTS). Anderson supported mother's treatment and regularly visited her.

During mother's initial assessment with WFTS, she reported that she had used methamphetamine once at age 27, then twice in November 2002, and once in July 2003. The assessment notes that mother appeared to be minimizing her drug use and that, although mother said that she wanted treatment, she also denied any concern about relapse, which was inconsistent with recognizing her need for treatment.

Nevertheless, mother successfully completed the program. The discharge summary from WFTS, dated January 22, 2004, indicated that mother's prognosis was good if she continued in outpatient treatment and participated in 12-step meetings. Pitcher testified that she strongly encouraged mother to enter a halfway house that offered ongoing drug counseling, job training and placement, parenting classes, and other services, and where the children could be returned to her. In Pitcher's experience, people who have just completed in-patient treatment have a greater chance of success if they enter a halfway house than if they reenter the community directly.

At trial, however, mother denied that Pitcher had recommended going to the halfway house, although she acknowledged that Pitcher and WFTS staff had "mentioned" the halfway house as "an option." Mother had health problems that required surgery in December 2003, while she was in the WFTS program, and again in February 2004, after the program ended. According to mother, she and Pitcher decided that it would be better for her to move into Anderson's home than to go to the halfway house. Mother told Pitcher that she wanted to have the children with her and, after some investigation, Pitcher concluded that Anderson's home was a safe place for the children. Mother moved in with Anderson after completing the WFTS in-patient program.

The expected recovery time for mother's February 2004 surgery was two weeks, although mother testified that she was "laid up for a good three weeks, almost a month afterward." Mother and Anderson testified that she took

Percocet, a prescribed pain medication, through the middle or end of March. However, a doctor's note—based on mother's own report to the doctor in March 2004—stated that mother "was prescribed Percocet 2/20/04 #30 for post-operation pain. She took the last dose 3/4/04." Consistently with that timing, the family decision meeting record for March 10—which mother signed—stated that mother "is now off all pain medication."

The record of that family decision meeting stated that the "[c]hoices are all about when the kids will transition home," with a planned return date of March 17. (Underlining in original.) The document also indicated that, as part of a safety plan, mother would provide UAs and that "any UA's [*sic*] dirty for narcotics will jeopardize the return home plan."

The day before the children were to be returned to mother, however, Pitcher learned that, on March 10 (the same day as the family decision meeting), mother had a UA that was positive for methamphetamine. The children, therefore, were not returned to mother, although mother denies that she was using methamphetamine and Anderson and grandmother believe her. As support for her view that the UA was inaccurate, mother contended that the UA should have reflected her use of Percocet but should not have been positive for methamphetamine. Mother's doctor indicated that Percocet would cause a positive UA for opiates, though not for methamphetamine—but nothing in the record supports the theory that a UA would be positive for opiates six days after the last dose of Percocet.

During the time period of that positive UA, mother was not participating in scheduled aftercare following her completion of the WFTS program. She had been scheduled to begin aftercare treatment a few weeks before her February 2004 surgery; indeed, in her relapse prevention plan she acknowledged that her "personalized relapse symptoms" included "not going to meetings, not calling my sponsor, not working my program, missing aftercare meetings." Nevertheless, mother's discharge summary stated that she came to only one aftercare group session, at the end of March 2004. Mother was discharged for noncompliance that May and was given a "very poor" prognosis.

Around the time of mother's discharge from the WFTS aftercare program in May 2004, DHS was relieved of responsibility to work with both parents. Mother could have asked to continue submitting UAs but did not, although at trial she stated that she had not known that she could make such a request. The petition to terminate mother's parental rights was filed in June 2004.

During that same month, mother tried to arrange for aftercare at Prevention and Recovery Northwest (PRNW) (where she had first gone for drug counseling), because she thought that transportation would be easier for that program than the WFTS aftercare program. Mother had a UA in late June 2004 and, although the specimen was diluted, the positive result was confirmed as methamphetamine. Mother denied that she had used methamphetamine and suggested that the UA was diluted because she had drunk too much water; she claimed that she had not known about the possibility of diluting the UA. Mother also did not complete the PRNW program, attributing her failure to participate to conflicts with her work schedule. However, her job actually ended in late July, and she was not terminated from the program for noncompliance until August 2004. Mother did not participate further in aftercare and denied receiving recommendations for further treatment when she left that final program.

In November 2004, mother announced that she was moving to California with a new boyfriend, whom she had known for a week. Mother "thought that moving to California would be a good way to get away from everything that was going on that year, drug wise." However, she testified that, soon after arriving in California, she learned terrible things about the man and promptly returned to Oregon. She and Anderson reconciled on her return, and they were living together at the time of trial.

It appeared to Pitcher that mother would use drugs for several months and then stop for a few months and that mother had "a lot of denial" about her drug abuse. Consistently with that view, mother agreed that she could "take drugs up and put them down kind of at will." At trial, mother testified that she had no plans to finish aftercare, explaining,

"I [have] isolated myself from quite a few things and it's been working for me that way." During the year before trial, mother did not participate in aftercare or any 12-step programs.

Anderson and grandmother testified that mother was no longer using drugs. Anderson saw no signs of methamphetamine use, such as twitches, changes in facial appearance, or sleeplessness, from spring 2004 through trial. He testified that mother kept a regular schedule and that there was no drug paraphernalia in the house. However, he acknowledged that he also had not seen any signs that mother was using drugs in the fall of 2003 when she had a positive UA. Grandmother likewise testified to the belief that mother was no longer using drugs, because mother typically called her several times a day, whereas mother "is not very communicative with me when she uses drugs and she gets real skinny." Grandmother had not seen mother like that for "[a]bout 3 years" before trial, although she acknowledged that mother had used drugs in July 2003.

Pitcher acknowledged that mother is a good parent when she is not under the influence of drugs. Grandmother also testified to her belief that mother is a good parent and to her intention to watch for any further drug use on mother's part. Mother has regularly visited the children, and she testified that she and Anderson have a neat, clean home ready for the children. Anderson likewise expressed his willingness to assist mother in raising the children.

We turn to the evidence regarding father. DHS's concerns about father related to his involvement in domestic violence and alcohol abuse. Father had some history of criminal behavior not involving his domestic partners and of domestic partners seeking restraining orders. After a June 1999 incident, father pleaded guilty to a charge of harassment involving offensive physical contact. In early 2000, father's former girlfriend sought a FAPA order against him, based on allegations that he chased her down in his car and threatened the lives of her and her friends. Two years later, father's first wife[2] obtained a FAPA order against him that

---

[2] Father has a daughter with his first wife; the child lives with her mother and is not involved in this proceeding.

was continued in 2004, based on allegations that he threatened the lives of her and her boyfriend. Both petitions identified drug and alcohol use as a factor in the incidents of abuse. Father denied the allegations of both restraining order petitions. Father also had two convictions in 2000 for disorderly conduct, at least one of which involved offensive contact with another person. Father was convicted in March 2002 of reckless endangerment. As noted, mother obtained a FAPA order against father in April 2002.

In February 2003, Sweet performed a psychological evaluation of father. He observed that father was at least superficially cooperative, but believed that father minimized or failed to recognize problems. For example, father told Sweet that mother had not known that drugs were in the car in the June 2002 incident, although mother has admitted otherwise. Father also expressed the view that mother had not been using drugs because she would never do that to the children, although that also appears not to be the case. Sweet also questioned father's denial that he had problems with alcohol and his denial of any physical violence toward women.

Sweet concluded that father functions on a concrete level and would have difficulty with effective communication, problems that could prevent him from benefitting from services. Sweet described father as someone who

> "may be vulnerable to real or imagined threats and feel anxious much of the time. This is the type of person who overreacts to minor stress. He may not be able to express his emotions in an adaptive, modulated way. What you may see is him alternating between over[-]control and direct uncontrolled outbursts. This, of course, could be exacerbated by any alcohol or drug use. He does appear to be a highly suspicious and untrusting person and, at times, may even appear to be thinking in a paranoid manner."

Sweet diagnosed father with borderline intellectual functioning and concluded that more investigation was needed to rule out additional problems, possibly including a personality disorder, alcohol abuse or dependence, and paranoid ideation.

Pitcher referred father to a combined drug and alcohol and domestic violence treatment program, ACES/NOVA.

Father completed the drug and alcohol component between December 2002 and February 2003. At the initial assessment, father identified arguments with his domestic partner as a negative consequence of drinking, but denied having a problem with alcohol. He reported earlier use of marijuana, methamphetamine, and cocaine. A treatment plan review stated that father was fully compliant with his treatment and that "[h]is history of non-completion of treatment seems to be of no consequence at this time."[3] The discharge report stated that father had been fully compliant, appeared to recognize his problems with drugs and alcohol and to internalize information about preventing relapse, and had maintained abstinence during the program, as verified by oral reports and random UAs. Father testified that he learned from the program to avoid situations that had gotten him into trouble in the past.

Father did the intake for the domestic violence component of the program in January 2003. A program facilitator observed that father tried to present himself in a favorable light and took limited responsibility for his actions; father admitted to verbal abuse, restraining mother's arms, and breaking household items, but "he only took accountability in the context of explaining his behaviors in conjunction with what he identified as her behaviors (*i.e.*, 'I restrained her arms, but only because she was going to hit me,' or '[w]e both called each other names.')." In an April status report, the facilitator wrote that father participated sporadically in the group process, appeared guarded in his comments, and "was observed to explain everything he stated, as if possibly paranoid and as if to make sure what he stated could not be interpreted in a way that would make him look bad." Father acknowledged past "violent behaviors" but denied any ongoing problems.

In May 2003, father contacted Pitcher to request a referral to a less expensive program. Pitcher referred him to Christians Against Family Abuse (CAFA), a free program. In

---

[3] Father apparently had previously participated in the program for three months in 2000 and again from May to July 2002, during which times he had some invalid and positive UAs. He was noncompliant during those earlier sessions. The noncompliance report from 2000 stated that father had "exhibited hostile and violent compulsions" during the program and had made threatening statements.

September and October 2003, Pitcher wrote to father, emphasizing that he was expected to successfully complete domestic violence counseling and informing him that she had not received any confirmation of his participation in the CAFA program. It appears that father did not participate in the program for several more months, although he did participate in an anger management class at the Center for Community Counseling from September to November 2003. Taggart, a mental health counselor, testified that father was disruptive during one class—interrupting others and speaking loudly—but, after he and Taggart discussed the situation, father participated appropriately in the rest of the classes.

In October 2003, father consumed alcohol before a visit with the children. His visits with A, with whom he has no legal relationship, were terminated as a result, and he expressed anger toward DHS about that.

In December 2003, Pitcher wrote to father to commend him for completing the anger management class and to remind him that he still needed to participate in domestic violence counseling. In the same letter, she commented that his October 2003 alcohol use was a concern, given that he had completed alcohol treatment the previous year. Pitcher also informed father that DHS had "no plan to return [B] to [father] but rather hoped to reunite the children with their mother."

Father began the CAFA domestic violence program in February 2004 and completed it the following October. The program normally takes one year to complete but, to comply with DHS's instructions, father took multiple classes in some weeks in order to finish sooner.

CAFA's February 2004 domestic violence risk assessment identified concerns that father's self-report of domestic violence differed from police reports and that father blamed the victim and believed himself to be the real victim. Nevertheless, father worked diligently at the program. Rexius, a clinical social worker and the director of CAFA, wrote to DHS in May that father was complying with CAFA's policies, was an excellent participant in groups, and expressed interest in improving his parenting skills. In August, she wrote that father was actively engaged, showed an enthusiastic

interest in learning parenting skills, and demonstrated a willingness to explore and use self-regulation skills; he had a good attitude and tried to apply the principles discussed to his own situation. Rexius observed that father was very interested in the parenting segments of the program.

Father testified that the most important thing he learned from the CAFA program was to let children make their own choices and not try to make choices for them. He also testified that he had learned not to respond defensively to constructive criticism but to accept that "people have their own opinions." Rexius testified that CAFA has shown good success rates, although the data were somewhat limited.

As noted, DHS was relieved of the obligation to work with mother and father in May 2004, and the petition for termination of father's parental rights was filed in the following month while he was engaged in the CAFA program. Trial was initially set for April 2005, but was reset for November 2005 to allow DHS more time to work with father and monitor his progress.

In April 2005, Sweet evaluated father for the second time. Father's performance IQ dropped significantly between the 2003 and 2005 evaluations. Sweet testified that IQ typically is stable, so the drop was unusual. Although he identified a number of potential causes for the drop—a lack of effort in taking the test, a head injury, or drug or alcohol abuse—Sweet did not know what caused the change. He also acknowledged that the IQ test result may have been inaccurate, although he considers such tests to be 95 percent accurate.

Sweet used information that he had received from DHS in his evaluation, including a report that, during the domestic violence component of the ACES/NOVA program, father "did not behave appropriately and * * * blamed other people for provoking him"; that father completed the CAFA domestic violence program; and that father did not complete drug and alcohol treatment. The latter statement was incorrect; Pitcher testified that father completed the drug and alcohol component of ACES/NOVA in February 2003.

According to Sweet's evaluation, father often digressed and complained about the way that the state has treated him and mother. Father believed that DHS was wrong to remove the children; that DHS kept bringing up "bogus" allegations about him; and that, whenever he finished one program, DHS wanted him to do something else. Nevertheless, father told Sweet that he had learned from the services and had learned parenting skills at CAFA. Father also reported an improved ability to recognize when he is becoming angry and to deal with anger. He denied being physically violent in the past but admitted to yelling.

Sweet wrote that father's performance on the Minnesota Multiphasic Personality Inventory-2 (MMPI-2) personality assessment tool in 2005

"suggests significant pathology which was not noted in the previous evaluation. In fact, in 2003, he was very defensive and seemed to be under[-]reporting problems. The current test suggests this is an extremely suspicious, untrusting, and possibly paranoid individual. He is likely to misperceive social stimuli. He feels people do not understand him and that he gets a raw deal in life. He appears to be very bitter, angry, and resentful. * * * The test also suggests he has characteristics commonly found among individuals who abuse alcohol or drugs."

Sweet diagnosed father with borderline intellectual function and a personality disorder, not otherwise specified, with paranoid, passive-aggressive, and dependent characteristics. Sweet continued to think that the possibility of alcohol abuse and dependence needed further investigation.

Sweet opined that father was not ready to parent B and would not be in the foreseeable future. He did not recommend further services because father "has completed most of the services but, once again, does not see a need for them and does not appear to benefit from them." Sweet expressed concern that father might become physically or verbally abusive and frighten B. Sweet also was concerned that father might experience delusional or paranoid thinking, as when he accused DHS of placing cameras at his home; Sweet explained that such paranoia "could be pretty scary for kids because there is not a basis in reality." Sweet, who never

observed father interacting with children, was "not speaking about [father's] relationship to his child or what he does with his child" but rather was talking about "parental capacity."

Father completed all required services, as well as an anger management class. Neither Pitcher nor Chapman, the DHS caseworker who took over the case in June 2004, knew of any incidents of domestic violence or other violence involving father since the inception of the case, and father testified that he had no incidents of domestic violence after DHS became involved with the family, had not used drugs, and had not drunk to excess. Other than a speeding ticket and a traffic ticket for running a stop light, father had had no contact with the police during the duration of DHS's involvement.

Father testified that, "like anybody else," he gets angry at times, but no more than the average person. In his view, he has put up with a lot from the state and has done his best in difficult situations. Father acknowledged telling Sweet that DHS's concerns about his temper were "BS," explaining that "I don't have physically violent behavior. * * * My mouth running when people say something, I say mentally hurtful things that I learned to say different now." Father testified that he no longer screams or shouts at people, as he used to do.

Father testified that he resents DHS's involvement with the family and believes that returning B to mother "would help her with the problems she's had and that's all she's ever needed is her kids." Although father claimed not to understand why B was removed, he admitted that the family had "problems" at the time of the removal and acknowledged needing help for "being mentally abusive." According to father, his relationship with mother had been strained by financial pressures, and "the mental anguish that we both put on each other and the financial wasn't a good situation" either: "It's good now but at that time, probably not." Father testified to his belief that the state was trying to emotionally destroy him and commented, "I would prefer not to do that to my own son because he's a very loving, caring child but I already see it in him. They are starting to do to him what they did to me and I don't believe in that."

At the time of trial, father was employed and was living with a roommate in a home equipped with a room for B. B has never lived with or had an overnight visit with father; indeed, father has never had a time when he alone was responsible for taking care of B. He recognized that, if B were returned to him, the transition would "have to be slow, a slow process. He's very attached to his grandmother for one, you know[;] he's been there since he was 4 days old."

Trial was held in November 2005, about a year and a half after DHS was relieved of the obligation to work with parents. Neither parent requested any services from DHS in 2005, nor did either parent ever request services that DHS failed to provide.

Apparently, for at least several months before trial, each parent had been allowed one hour of supervised visitation per week.[4] McClure, a DHS caseworker responsible for checking on the children in person, testified that both children are doing very well. B is periodically examined for any disabilities arising from mother's use of methamphetamine during pregnancy, but he has no real physical issues or significant developmental delays, although he does have some anger and boundary control problems. During visits, particularly in the visitation room, B is very physically aggressive and tries to hit mother and father; although B is two and is expected to engage in some oppositional behavior, the extent of the behavior is greater than normal. B is a bit calmer at grandmother's house, and she does not report seeing such behavior. McClure testified that he was "very impressed," when observing father's visits with B, with father's "patience and his ability to keep his son safe and to redirect him into more appropriate activities." Grandmother testified that B looked forward to visits with both parents.

The juvenile court ordered termination of both parents' parental rights. The court concluded that mother has not recognized the problems that she needs to remedy, has made no effort to improve her situation, and is too focused on her own needs to meet the children's needs. The court also

---

[4] The record is not entirely clear as to the frequency of visits that were allowed through the life of the case. However, it appears that both parents were regular and consistent in visiting the children.

found that mother was not a credible witness as to her drug use. The court saw her decision to move in with Anderson rather than going to the halfway house for treatment "as an example [of] mother's lack of judgment and unwillingness to put the children's needs above her own." The juvenile court found mother unfit on the bases of criminal conduct (apparently, drug use); addictive or habitual use of controlled substances; mental, emotional, or psychological abuse of the children; and physical and emotional neglect. It also found that she neglected the children by failing to implement a plan to reintegrate them into her home.

As to father, the juvenile court found that he has a long history of anger control problems. The court observed that he "was hostile on the witness stand and it took a real effort on his part to control his temper." Based on Sweet's psychological evaluation of father and father's presentation at trial, the court concluded that father "is paranoid and suspicious and sees no problems that need to be cured." The court also noted that father displayed a significant drop in his IQ scores and that, although Sweet could not identify the cause of that drop, it would be consistent with serious substance abuse. The court concluded that father was unable to act as a single parent for B and was unlikely to be able to do so within a reasonable time. The juvenile court concluded that father was unfit on the bases of failure to present a viable plan for B's return, failure to learn sufficient parenting and housekeeping skills, emotional illness or mental deficiency, physical and emotional neglect, and a lack of effort to adjust father's circumstances or failure to effect a lasting adjustment.

Both parents appealed. DHS concedes that, under *State ex rel Dept. of Human Services v. Squiers*, 203 Or App 774, 126 P3d 758 (2006), it did not prove neglect as a basis for termination under ORS 419B.506 as to either parent. As to mother, the parties' arguments on appeal focus on whether there was clear and convincing evidence that she was unfit based on habitual use of controlled substances and a lack of effort to adjust her circumstances—specifically, to address her drug problem. As to father, the arguments focus on whether there was clear and convincing evidence that father had mental problems—specifically, anger and paranoia that

he had not learned to recognize and control—that made him unable to safely parent B. Because we conclude that the evidence was insufficient to prove that either parent was presently unfit, we reverse and remand.

■■   We begin by examining the applicable legal standards and then apply those standards to each parent's case. ORS 419B.504 provides, in part:

"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child or ward and integration of the child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:

"(1)   Emotional illness, mental illness or mental deficiency of the parent of such nature and duration as to render the parent incapable of providing proper care for the child or ward for extended periods of time.

"* * * * *

"(3)   Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.

"* * * * *

"(5)   Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make it possible for the child or ward to safely return home within a reasonable time or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."

The statute requires a two-step analysis. First, the court must examine whether the parent has engaged in conduct or is characterized by a condition that is seriously detrimental to the child. Second, if the parent is unfit, the court must determine whether it is improbable that the child will, within a reasonable time, be integrated into the parent's home. *State ex rel Dept. of Human Services v. Smith*, 338 Or 58, 80-81, 106 P3d 627 (2005); *State ex rel SOSCF v. Stillman*, 333 Or 135,

145-46, 36 P3d 490 (2001). Termination is permissible only if the parent is *presently* unfit. *State ex rel Dept. of Human Services v. Rardin,* 340 Or 436, 448, 134 P3d 940 (2006). Facts supporting termination must be proved by clear and convincing evidence, that is, evidence that makes the existence of the asserted facts highly probable. *State ex rel Dept. of Human Services v. Simmons,* 342 Or 76, 96, 149 P3d 1124 (2006); *State ex rel Dept. of Human Services v. Hinds,* 191 Or App 78, 84, 81 P3d 99 (2003).

■    With those principles in mind, we consider the evidence regarding mother's unfitness. The dispute here focuses on mother's drug use. Pitcher, the DHS caseworker, acknowledged that mother is a good parent as long as she remains drug-free, and it is undisputed that the children are doing well in grandmother's custody. DHS also concedes that the evidence does not establish that mother has a mental illness that makes her unfit and has abandoned any allegation that the children suffered mental, emotional, or psychological abuse at mother's hands.

The juvenile court found that mother's testimony about her drug use was not credible. We likewise note that mother has, as recognized by the drug counselors who have worked with her, often minimized her drug use. The evidence is clear and convincing that mother relapsed and was using methamphetamine when she had positive UAs in March and June 2004. The evidence also supports the conclusion that mother's drug use has at times endangered her children: Her drug use during pregnancy exposed B to a risk of harm, and her drug use in July 2003 exposed the children to the dangers of a roll-over car accident. Under the circumstances, had the case gone to trial closer in time to those events, we might well have concluded that mother was habitually using methamphetamine to the point that her parenting ability was substantially impaired.

The evidence does not, however, support that conclusion at the time of trial. *See Stillman,* 333 Or at 148-49 (the possibility that termination might have been justified at an earlier time did not establish that the father was presently unfit). By the time of trial in November 2005, mother's last UA was about one and a half years old. The only evidence in

the record concerning mother's drug use after May 2004, when DHS was relieved of the obligation to try to reunite mother and the children, is the following: (1) mother failed to comply with her aftercare programs and was given a poor prognosis on her discharge from WFTS aftercare in May 2004; (2) in June 2004, she had a UA that was positive for methamphetamine; (3) she denies using after completing the WFTS program; and (4) Anderson and grandmother believed, based on their day-to-day observations of mother, that she was not using drugs. Given the juvenile court's credibility determination, we do not give weight to mother's testimony. We also note the possibility that Anderson and grandmother were mistaken about mother's sobriety.

Nevertheless, although the record contains evidence of a very troubling *risk* of relapse, it contains no evidence that mother continued to use controlled substances after June 2004. Nor did DHS introduce any expert testimony or other evidence about the likelihood that mother continued using illegal drugs or about any continuing effect of her past drug use on the children. We cannot, therefore, conclude that she was presently unfit on the basis of addictive or habitual use of controlled substances. The lack of any such evidence likewise precludes a finding that mother was unfit on the basis of either criminal conduct relating to drug use or lack of effort to adjust her circumstances by obtaining further treatment for drug use.

We recognize that DHS was in a difficult position in this case, as its ability to contact and work with mother was limited after May 2004, when it was relieved of the responsibility to do so, and mother did not request any services after that time. Nevertheless, we cannot ignore the requirements of ORS 419B.504. Because there was insufficient evidence of present unfitness, the juvenile court erred by terminating mother's parental rights.

We turn to father's appeal. Here, the dispute centers on whether father had problems with anger and paranoia that had not been successfully treated. DHS relies on father's history of violent behavior, Sweet's psychological evaluation, and the juvenile court's finding that father's demeanor at trial demonstrated that he had not benefitted from anger

management and domestic violence treatment. We understand DHS to contend, first, that father suffers from an emotional illness or mental deficiency that makes him incapable of providing adequate care for B and, second, that father has failed to effect a lasting adjustment in his anger problems that would allow B to safely return home.[5] We conclude that the evidence is insufficient to establish either basis for termination.

There was evidence that father had difficulties with anger. Sweet diagnosed father with a personality disorder, not otherwise specified, and expressed concern about father's level of anger and possible paranoia. The juvenile court found that "[f]ather was hostile on the witness stand" and that "it took a real effort on his part to control his temper."

However, with due respect, the anger and distrust toward DHS that was observed by the juvenile court and by Sweet in his 2005 evaluation of father followed father's experience of more than two years of participating in services required by DHS that did not seem to be bringing him any closer to reuniting with his child. Perhaps father did not always handle his frustration well, but we are not persuaded that his frustration with DHS evidences a personality disorder or other condition that is detrimental to child so as to render father unfit. Although father's anger may have led him to questionable conclusions, such as his belief that DHS had planted cameras at his home, the record contains no evidence that father's anger toward DHS affected his interactions with B. Hostility toward the agency, without more, is not evidence of a conduct or condition that is detrimental to B. *See Smith,* 338 Or at 84. Here, although Sweet opined that a parent's paranoid beliefs could be frightening to a child, there is no evidence that father expressed any anger or paranoia to B or

---

[5] DHS also suggests that father's problems "are exacerbated by his substance abuse." However, the record does not support a conclusion that father was abusing drugs or alcohol. Although father consumed alcohol before an October 2003 visit with the children, he testified at trial that he had not used drugs at all or drunk to excess since DHS became involved with the family in November 2002. There was no evidence to contradict that testimony. And although Sweet asserted that substance abuse was a possible explanation for the drop in father's IQ test score, that drop did not constitute *evidence* of substance abuse. Indeed, Sweet identified other possible causes for the test score unrelated to substance abuse, including a small chance of testing error.

that B was otherwise affected by any of father's emotional problems. To the contrary, McClure, a DHS caseworker who worked with the children, observed that father behaved appropriately with B, even though B is sometimes physically aggressive and oppositional. Indeed, McClure was impressed with father's patience and ability to redirect B to more appropriate activities.

Father also seems to have adjusted his circumstances in response to DHS's understandable concerns about his history of criminal convictions and the FAPA orders obtained by three of his former domestic partners. As we observed in *Proctor*, merely attending classes and other services is not enough, but a parent may take steps toward providing a safe home by actively participating in services and making adjustments consistent with the lessons learned there. 167 Or App at 27-28. Here, as in *Proctor*, father actively participated in and successfully completed services; despite initial resistance, he engaged in drug and alcohol treatment and anger management and domestic violence education programs. He displayed particular interest in improving his parenting skills. Contrary to Sweet's view that father had not benefitted from services, father was able to identify lessons that he had learned from them, and Rexius, who worked with father over an extended period, described him as an excellent, engaged participant in domestic violence treatment. Significantly, father seems to have ended former patterns of behavior. There is no evidence in the record that he has engaged in any violent or abusive conduct since DHS became involved with the family in 2002. Father's only contact with police since that time has been for traffic infractions. Because the record does not contain clear and convincing evidence that father is unfit, the trial court erred by terminating his parental rights.

Reversed and remanded.