Argued and submitted September 13, affirmed December 29, 2011

In the Matter of
K. J. C., K. M. C., and K. J. M., Children.
DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

C. L. C.,
*Appellant.*

Lane County Circuit Court
09170J, 09171J, 09172J;
Petition Numbers
09170J02, 09171J02, 09172J02;
A147897

268 P3d 808

Megan L. Jacquot argued the cause and filed the brief for appellant.

Justice J. Rillera, Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before Ortega, Presiding Judge, and Brewer, Chief Judge, and Sercombe, Judge.*

_____

* Brewer, C. J., *vice* Rosenblum, S. J.

ORTEGA, P. J.

## ORTEGA, P. J.

Mother appeals a judgment terminating her parental rights to her three children on the grounds of unfitness, ORS 419B.504. The Department of Human Services (DHS) originally took protective custody of the children after mother admitted that domestic violence and drug abuse occurred in their presence. The two older children were returned after mother participated in drug treatment and other services, but were removed again after mother allowed contact between father[1] and the children against DHS's wishes. At the eventual termination trial, mother contended that she had made progress in addressing the various concerns about her conduct and that no conduct or condition existed at the time of trial that was seriously detrimental to the children. In terminating mother's parental rights, the trial court noted that much of the evidence that mother had made improvements depended either on mother's testimony or on her statements to treatment providers; the court disbelieved that evidence because of persistent evidence that mother was untruthful, including lies that she told at trial. Deferring to that credibility finding and based on our own *de novo* review of all the evidence, we likewise find clear and convincing evidence that mother suffers from mental conditions that are seriously detrimental to the children. Accordingly, we affirm.

## I.  FACTS

We state the facts as we find them. ORS 19.415(3)(a) (appeals in termination of parental rights cases are reviewed *de novo*). We begin with a general chronology of the case before discussing in greater detail mother's mental health and the children's needs.

### A.  *General Background*

Mother's childhood was traumatic. She was raised by her father and stepmother, both of whom abused drugs, and was subjected to domestic violence and physical abuse

---

[1] The oldest child, KJC, has a different father than the other two children. KJC's father, however, has had no contact with KJC and was not a party to this case; his rights were terminated in a separate proceeding. For the sake of simplicity, all references to father in this opinion are to the biological father of the two younger children, KMC and KJM, whose rights were terminated by stipulation.

during her childhood. Her father also sexually abused her for several years, crimes for which he was eventually convicted and incarcerated. Mother was raped as a teenager. Mother's biological mother committed suicide when mother was a teenager. Mother spent three years in foster care. She began drinking, smoking, and using marijuana and methamphetamine before she turned 14. When she was 15, she ran away from home and took up residence with a 28-year-old man who emotionally abused her. After that relationship ended, she entered into a relationship with a man whom she married after two months. Before they separated six months later, they were involved in two incidents of domestic violence that resulted in police contact.[2] In 2002 and 2003, mother was using methamphetamine heavily, and she had a brief relationship that resulted in her pregnancy with her oldest child, KJC, who was born in 2004.

In 2006, mother became involved with father, and their relationship soon involved heavy use of methamphetamine. Father had a lengthy criminal history. Their relationship resulted in the birth of KMC in August 2007 and KJM in July 2008. It was also a relationship filled with domestic violence and drug abuse. While pregnant with KMC, mother obtained a restraining order under the Family Abuse Prevention Act based on allegations that father had threatened to kill her because she refused to abort KMC. Mother voluntarily withdrew the restraining order after KMC was born, and she became pregnant with KJM within weeks of KMC's birth. Mother used prescription medications throughout her pregnancy with KJM, although she testified that she did not use any illegal drugs during any of her pregnancies. When mother was seven months' pregnant with KJM, father smashed her foot with a cinder block in pursuit of prescription painkillers. In another instance of drug-seeking behavior, father broke mother's water during her thirty-fourth week of pregnancy. As a result, KJM was born six weeks premature and spent the first several weeks of his life in intensive care. After KJM's birth, mother and father regularly used methamphetamine in the presence of the children.

---

[2] Mother and her former husband were officially divorced on the day before the termination trial began.

In December 2008, mother fraudulently cashed three of her grandmother's checks. When a warrant issued to arrest mother for second-degree forgery, mother and father fled to Arizona with the children in early February 2009. They returned to Oregon after a couple of weeks, and mother left her children with relatives and turned herself in to the authorities. She was in jail when DHS first became involved with the children.

B. *DHS Involvement*

DHS took temporary protective custody of the children in early March 2009. Initially, a DHS caseworker received a report that KJM, then eight months old, had been abandoned at a hospital. KJM was hospitalized with acute respiratory distress and mother was in jail after turning herself in on the forgery charges. KJC and KMC were staying with separate relatives, and they were also ill. All three children were behind on immunizations. DHS also received reports that, despite his premature birth and extended stay in intensive care, KJM was not receiving appropriate follow-up medical care. When contacted by DHS, mother admitted that domestic violence and drug use occurred in the children's presence. KJC likewise confirmed to DHS that she had witnessed domestic violence. Mother admitted that she currently used drugs and needed inpatient treatment and informed DHS that father had threatened to harm her, the children, and himself and that, despite those threats, mother continually returned to father. DHS also received information that the family's home had rotting food and trash piled outside, and hypodermic needles were found in areas accessible to the children. The juvenile court entered a judgment of jurisdiction in May 2009.

Mother was released from jail in early March 2009, and she was immediately assessed at a drug treatment program. Mother was convicted of the forgery charges and was again incarcerated in mid-April 2009. She was sentenced to 60 days in jail with credit for time served and three years probation. The court imposed a special condition of probation that mother complete drug and alcohol treatment. Mother remained in custody until the middle of May, when she was

released to a work-release program, which she completed in early June.

After completing her sentence, mother entered an intensive outpatient drug treatment program. She completed the program in December 2009 and was described by her counselor as a "success story." She regularly attended group meetings and was open and honest during treatment. Mother was continually subjected to urinalysis tests (UAs) during the treatment program, and all of them were clean.

While she was in treatment, DHS referred mother to the Mutual Home, a transitional living program for mothers in recovery whose children are involved with DHS, which mother then entered in August 2009. DHS also provided mother with referrals for domestic violence classes, individual counseling, and parent training.

Mother graduated from a 12-week parenting program, in which she performed well and was a positive group member. She also participated in parent training with an in-home parent trainer from September 2009 until January 2010. The trainer testified that mother demonstrated consistency and follow-through with the children and improved her parenting skills. The trainer also noted, however, that, when mother moved from the Mutual Home to her own apartment, the environment became more chaotic and the children's behavior deteriorated.

Mother participated in an initial assessment for domestic violence and individual counseling in November 2009 at Options Counseling. She was placed on a waiting list for the domestic violence group sessions and was eventually offered a spot the following January. Mother accepted, but did not attend the first session and was placed back on the waiting list.

Shortly after mother moved to the Mutual Home, DHS, with the juvenile court's approval, began the process of returning the oldest child, KJC (then five years old), to mother's care, with the intent to return all three children in a staggered fashion. KJC was returned first, and KMC (then two years old) returned home about a month later, at the end of October 2009. DHS began the process of returning KJM,

then just one year old, but mother asked DHS to delay the transition because she was feeling overwhelmed, and DHS agreed.

In December 2009, Mutual Home staff contacted DHS with concerns about KJC's school attendance. Mother was not getting KJC to school consistently and failed to take her to school the week before winter break because mother was mistaken as to the break's start date. In addition, mother lied to the DHS caseworker about where KJC was enrolled, and, when the caseworker contacted the correct school, the school informed her that KJC's attendance record was very poor.

Mother left the Mutual Home in early January 2010 and moved to an apartment with KJC and KMC. DHS recommended that KJC enter counseling because she had witnessed significant domestic violence; the caseworker located an opening with a counselor and informed mother. Although mother indicated interest, she never followed through.

Later that month, mother contacted DHS to cancel a scheduled home visit because one of the children was sick, but the children's attorney did not receive notice of the cancellation. When he arrived at mother's apartment, KJC answered the door in her underwear and told the attorney that mother was not at home and that only KMC was at home. Shortly thereafter, the attorney observed mother entering the apartment. Mother informed the attorney that a babysitter had been sleeping in the back room with KJM and had not heard the attorney's knock at the door. When the DHS caseworker visited the apartment the next day, mother gave her minimal information about the babysitter and then admitted that there actually was no babysitter and that she had left KJC and KMC at home with father, contrary to DHS's instruction that the children were not to have contact with him. Mother also had instructed KJC to lie to the caseworker about the babysitter.

DHS again removed the children from mother's care and, shortly afterwards, mother signed an action agreement with DHS. Mother initially indicated that she wanted to work towards regaining custody of the two older children, but that she was not sure if she could meet KJM's needs. Shortly

thereafter, however, mother indicated that she wanted to engage in services to regain custody of all three children. Around that time, she began a relationship with King, whom she met at a Narcotics Anonymous meeting, and then moved in with him a few months later. She continued to reside with King and his eight-year-old son in a tidy three-bedroom house at the time of trial.

In April 2010—13 months after the children first entered protective custody—DHS decided to proceed towards termination of mother's parental rights. The juvenile court approved changing the permanency plan to adoption two months later, and DHS filed a termination petition based on several nonexclusive statutory bases, including addictive or habitual use of controlled substances, exposing the children to domestic violence, neglect, emotional or mental illness, and failure to provide a safe and stable home.

That summer, mother was again offered a spot in the domestic violence group counseling sessions at Options. She attended several weeks with periodic absences, and then missed several sessions in September 2010 due to claimed illness. The following month, Options asked her to restart the program due to the absences; she did so and had attended nine of the 20 required sessions by the time of trial.

Mother also was offered individual counseling at Options to address her post-traumatic stress disorder (PTSD). She met with McKean in May 2010 to begin individual sessions, but attended no further sessions and, eventually, McKean closed her file and referred mother to a group. When DHS questioned mother about her progress in counseling, mother indicated that McKean had informed mother that she was a "crisis" counselor, that mother needed a long-term counselor, and that McKean would place mother on a waiting list for a more appropriate counselor. However, McKean testified at trial that she never told mother any such thing and that she was a long-term counselor.

Mother got a job at St. Vincent de Paul's in July 2010, but was terminated in early September after she failed to show up for work without calling on several occasions. Mother later claimed that she had provided a doctor's note to her employer, yet she was terminated anyway. However,

despite repeated requests by DHS, mother never produced the claimed doctor's note. In fact, DHS's investigation revealed that mother's primary care physician had notified mother that the medical clinic would no longer provide mother with medical care because of her failure to keep scheduled appointments.

That same summer, DHS asked mother to again submit to random UAs. In September, mother missed a UA and called the DHS caseworker that night in a panic because she feared that DHS would count the missed UA as "dirty." Mother maintained that she had been in court that day supporting a relative and that she had missed the message to submit to the UA until it was too late. The caseworker informed mother that the UA would not be considered "dirty" if mother could provide documentation of where she had been that day. Mother failed to do so, though she produced several witnesses at the termination trial to support her version of events. Mother also submitted to a UA the day after her missed appointment, and that UA showed no sign of drug use.

In December 2010, mother began working at a home for developmentally disabled children. At the termination trial the following month, mother testified that she was on leave from that job for the trial and that she had disclosed to her employer her criminal history and involvement with DHS. Mother was lying. Her employer later testified that mother had not made the claimed disclosures and that he had actually terminated her two days before trial began upon learning about her history in a background check. He also testified that mother was a good employee in her short time there and that she worked well with the children but that she would not have been hired had she disclosed her forgery convictions and her history of involvement with DHS.

## C. *The Children's Special Needs*

KJM, who was two at the time of the trial, has significant special needs. He suffers from impaired motor, social, communication, and cognitive skills and has been placed in a medical foster home. At birth, he was diagnosed with Macrocephaly, an enlarged head. His development since birth has been marked with severe delays and problem

behaviors. His fine motor skills and verbal ability are delayed and he has prolonged crying fits. He bangs his head when upset or excited and must sometimes wear a helmet. He cries when he does not receive one-on-one attention, hits himself and others, and is overly friendly with strangers. He will eat food until he vomits and will eat vomit, garbage, and his own feces if not properly supervised. He has been diagnosed with an adjustment disorder and is at risk for reactive attachment disorder. He requires a very consistent schedule and routine. His foster mother estimated that she must dedicate 75 percent of her energy to KJM's care, while the other three children in her home receive the rest of her attention.

A pediatrician testified that KJM would do best in a home where he would receive undivided attention. He also opined that KJM is at risk of institutionalization if he is not placed in a positive environment.

An action agreement between mother and DHS dated two months before trial provided that KJM would participate in the EC Cares group, which is a toddler group that strives to teach parents skills to deal with challenges based on the child's developmental and social needs. Mother participated in that program along with KJM's foster mother.

KJC, who was six years old at the time of trial, has been diagnosed with an adjustment disorder. She is behind in her schooling and has significant speech impediments. Her current foster mother noted that KJC was quiet and withdrawn when placed there a year before trial; she would not engage socially and would hang back and watch, and when she did engage she often exhibited "parentified" behavior towards the other children in the home. She also exhibited sexualized behavior, although the genesis of that behavior is unknown. She was obese, didn't know how to wash herself, and required dental work. Since that time, KJC has lost considerable weight and has "come out of her shell."

DHS recommended that KJC receive counseling because she had witnessed domestic violence—but, as noted, mother failed to enroll KJC in counseling when given the opportunity. By the time of trial, KJC was receiving counseling, and her therapist testified that they were working on KJC's withdrawal and her inability to express her emotions.

In therapy, KJC spoke of having to care for her siblings when mother was sick, and she discussed missing her mother and siblings. Although her therapist did not think that KJC suffered from PTSD, she opined that witnessing domestic violence can increase a child's risk of problems down the road and that KJC needs a loving, safe, and structured home to continue her progress.

KMC, who was three years old at trial, was first placed with father's mother in March 2009 and, at that time, exhibited signs of her unstable home life. She gorged on food, hit herself, and had trouble sleeping. She quickly progressed and became "well-adjusted." However, when she was again removed from mother's care in January 2010, she showed signs of regression; she again had problems sleeping and seemed distressed. At the time of trial, KMC had again progressed and was doing well in foster care.

At DHS's request, Dr. Sorensen evaluated the children to determine whether it was appropriate to place them in separate homes. He ultimately concluded that the attachment between the siblings is weak and that separate placements would be appropriate. KJC exhibited a significant degree of detachment from her parents and siblings during Sorensen's evaluation.

D. *Mother's Mental Health*

Dr. Basham twice evaluated mother. Because they are the only psychological evaluations in evidence and because DHS's case relies heavily on them, we examine them in some detail.

The first evaluation occurred in June 2009. Basham diagnosed mother with polysubstance dependence in early full remission, PTSD, major depressive disorder in partial remission, and relatively mild antisocial personality traits. He noted that her PTSD resulted from "abuse in past relationships, as well as unresolved issues from sexual and physical abuse as a child." He opined that mother "may be attracted to men with antisocial personalities" and that her unresolved PTSD likely contributes to her codependency. He noted that domestic violence counseling might reduce the

risk that she would be involved with another abusive partner. He also concluded that mother's intellectual functioning showed no deficiencies that would prevent her from understanding or appreciating the children's needs. He stated that there did not appear to be a barrier to mother benefitting from services and that, if she remained drug-free she could be a good parent. He cautioned, however, that her indications of antisocial personality traits were a "poor match" to parenting because individuals with such traits tend to be irresponsible and intolerant of excess demands and responsibilities—which are characteristic of special needs children. Overall, Basham noted that, if mother completed treatment and services, her antisocial personality traits might decline, which would reduce her risk of being involved with an antisocial partner and improve her prospects for parenting. He recommended domestic violence counseling, individual therapy, and continued drug treatment.

When Basham evaluated mother again a month before trial, he noted that evidence of mother's antisocial traits was the same as before according to one method of testing and had shown a slight decrease under another test. Mother also showed increased signs of codependence. He explained at trial that the "seemingly lower score" on the latter test could have been a result of her increased defensiveness.

His overall diagnosis changed only marginally. Basham again diagnosed mother with PTSD, major depressive disorder, recurrent but in partial remission, and antisocial personality traits. He noted that mother exhibited higher degrees of denial and that there were large discrepancies between mother's portrayal of events and those from external sources. In particular, Basham noted that background reports showed multiple requests for abusable medications from medical providers despite mother's professed sobriety, yet he also acknowledged that any problems she exhibited between the two evaluations were not due to active drug abuse. Basham concluded:

> "There are concerning signs that [mother's] lack of insight and inability to see her behavior from the perspective of others is causing disruption to her life. She has been fired

from her job and dismissed by her primary care physician * * *. Insightfulness is crucial to parenting, particularly when the children have special needs and are vulnerable to any failure to understand and meet their needs. Denial is not a DSM-IV diagnosis, but it is a psychological condition that explains the problems [mother] has had in fulfilling her DHS service agreement. Her denial is also a primary concern about future functioning of three special needs children. [Mother's] denial likely stems from her PTSD from past abuse. Although she has been participating in domestic violence treatment, she indicates she had to start the program over again. She states that she has to start over only because she missed three groups due to illness, but her explanation raises the question of whether there were additional concerns of which she is not aware. A review of treatment records indicates she missed more than the three weeks she reported during the interview. She states her individual therapy was initially twice per month, then once per month. Most therapy is weekly, particularly initial stages of treatment, and it is doubtful that [mother's] individual treatment has been frequent enough to improve her self-awareness and reduce her denial. The frequency of treatment seems to be largely her own choice. She indicated that was previously due to her work schedule but she is not currently employed so her schedule should not now be a barrier to more frequent treatment.

"In terms of managing her emotions and understanding how her behavior affects others, [mother] has shown little progress in the past year. She relies on medications to deal with her depression and anxiety, including use of an abusable medication for her anxiety.

"A primary question in terms of [mother's] parenting potential is her ability to benefit from services, so her lack of progress over the past year is a significant concern. That is particularly true when considering the fact that [the] children have special needs and that the previous attempt to return them to her care ended after four months, when she allowed [father] to visit the children in her home. Although [mother] indicates she believed that she was acting out of the children's needs in allowing to have unauthorized visits with [father], * * * given her PTSD, it was more likely a matter of her own dependency needs and her unresolved PTSD. There are times when [mother] experiences strong feelings of dependency, and she is inclined to

have relationships with weak boundaries. There is a continuing risk that [mother] will expose the children to violence or threat of harm by making choices based on her emotional needs, without considering the children's needs for safety and protection.

"Although [mother's] diagnoses are not so severe as to leave her incapable of parenting, they are nevertheless risk factors for parenting high needs children, and [mother] has shown little evidence of being able to benefit from services or being able to overcome her problems over the past year. She is currently showing greater denial and greater resistance to services than was true a year ago, and her prospects for parenting have decreased. * * * Before she could be considered ready to parent, [mother] would need to show significant gains in her treatment for [PTSD], increased awareness of personal issues, and increased ability to deal with her anxiety and depression."

At trial, Basham opined that, based on mother's traumatic upbringing—sexual abuse by her father, her parents' drug abuse, the suicide of her mother, her rape as a teenager, and time spent in foster care—mother could expect problems throughout adulthood if she did not receive adequate mental health treatment:

"Unresolved abuse, maybe a sexual abuse or physical abuse or even experience of neglect by a parent fails to provide a child a background of security and confidence and dependence upon adults that is really necessary for a positive adult adjustment, particularly an adjustment of a parent themself."

The doctor noted that the pattern of her adult relationships demonstrated that she did not have enough counseling as a child to resolve issues related to the years of sexual abuse that she suffered.

When asked to explain mother's progress between the two evaluations, Basham noted that she had made some progress in stabilizing her personal relationships and finances. However, the reports that he had reviewed of mother's counseling indicated incomplete attendance at her domestic violence group counseling sessions, and he stated that the frequency of her individual counseling sessions was not sufficient to address her problems.

Basham noted that mother's continued problems did not appear to be related to active drug use; instead, her continued instability was attributable to her mental or emotional problems. He opined that her failure to follow through and her general instability reflected that she had not had sufficient treatment to address the trauma and abuse she suffered as a child. He also indicated that the change needed for mother to address her mental health issues required "sustained effort and usually the assistance of mental health treatment or other forms of services that are appropriate."

He noted further that denial is a barrier to successful parenting because

"awareness and insight of problems is the first step in overcoming them. Mental health treatment rarely works when someone doesn't recognize they have a problem and then have desire to overcome that. So it would interrupt [mother] resolving the issues from her childhood and from abusive relationships. It would disrupt parenting also.

"It can prevent her from staying sensitive and attentive to the children's needs. You don't want a parent who denies that the children have problems or denies that there's something—there's some kind of help or services the children require."

Basham concluded that mother was coping through denial. He confirmed that dishonesty is a common behavior associated with antisocial personality traits and noted that antisocial personality traits are "strongly associated with irresponsibility" and can lead to problems properly socializing children.

On cross-examination, Basham acknowledged that his evaluations were based on information provided by DHS and his interview of mother. As such, DHS provided Basham with the information that it decided was relevant to the evaluation, and he did not have information from her successful drug treatment or parenting classes. He was not aware that she had successfully completed the UA Hotline and had not reviewed the portion of her domestic violence counseling file, which noted that the only areas of concern had to do with mother's attendance. He further acknowledged that he generally received only information on the programs in which

mother had failed to follow through, and did not receive information from those programs in which mother had achieved some level of success.

E. *Juvenile Court Ruling*

At the close of evidence, the juvenile court orally ruled in favor of DHS's petition to terminate mother's parental rights. The court stated:

> "First of all, mother avoided doing a great variety of things that DHS requested her to do, and during the course of their confronting her with her failure to do particular acts, she consistently lied, to her benefit, about why certain things weren't done, why appointments weren't made, why programs weren't taken care of in the usual course or in a timely manner, and maintained those lies about why things weren't done until the course of this trial, when she got on the stand and admitted that she was untruthful. The record is replete with those examples * * *.

> "Then her testimony was that since the children were taken away in January of '10, she's had some sort of an epiphany, and has seen the light, and has attended everything that she says she's attended, to show to me, I suppose, that her present situation is such that I should believe her when she says she's going to turn into the perfect parent, if not perfect, better than average parent, or at least minimally capable parent, and that I should consider that this epiphany has taken place, and now, the children, it's not in the best interest of the children that they be terminated.

> "The last few minutes of testimony this morning, though, have shattered that illusion. She testified affirmatively on direct of three significant and remarkable inaccuracies of reality. She testified that she has this job; that she disclosed DHS involvement; and that she disclosed her forgery convictions; and she testified that she's on leave from this job for this week to attend court proceedings.

> "All of those were flat-out, bald-faced lies.

> "* * * * *

> "I think everybody who is a lawyer knows that there is a jury instruction for the fact finder—and I am the fact finder—that if a witness is false in part in their testimony, the court may distrust the rest of their testimony.

"This pattern of deception leads me to believe, conclusively, that everything she told me about her remarkable change of life cannot be believed. I cannot believe that she would do and continue to do and would perform all those things that are necessary for these children to be returned to her care.

"I do dismiss all of her testimony, because I have no choice, in the sense that nobody in their right mind would believe her now.

"I find all the paragraphs of the petition have been proven."

The juvenile court entered a judgment terminating mother's parental rights, and mother appeals.

## II. ANALYSIS

The juvenile court terminated mother's parental rights for unfitness. ORS 419B.504. Accordingly, the state has the burden of proving, by clear and convincing evidence, that mother is unfit because mother engaged in conduct or is characterized by a condition that is seriously detrimental to the children and it is improbable that the child can be integrated into mother's home within a reasonable time because the conduct or condition is unlikely to change. *State ex rel SOSCF v. Stillman*, 333 Or 135, 145-46, 36 P3d 490 (2001). "Evidence is clear and convincing if it makes the existence of a fact highly probable or if it is of extraordinary persuasiveness." *State ex rel Dept. of Human Services v. A. M. P.*, 212 Or App 94, 104, 157 P3d 283 (2007) (internal quotation marks omitted). The fitness of the parent is measured at the time of the termination trial. *State ex rel Dept. of Human Services v. Simmons*, 342 Or 76, 96, 149 P3d 1124 (2006). The focus of the test is "on the detrimental effect of the parent's conduct or condition on the child, not just the seriousness of the parent's conduct or condition in the abstract." *Stillman*, 333 Or at 146.

On appeal, mother asserts that her conduct or condition was not seriously detrimental to the children at the time of trial. She contends that the record on balance shows that she is a fit parent. In particular, mother points to favorable testimony about her parenting abilities, interactions with the children, and compliance with services. Further,

mother maintains that her mental health issues were minimal and, regardless, she received treatment and engaged in requested services to treat any mental health problems. Mother contends that, at the time of trial, she had been clean and sober for almost two years and was engaged in a stable, two-income relationship. She also argues that, at the time of the incident that led to the second removal of her children, she did not have the benefit of domestic violence counseling to show her the error of her ways. Finally, mother explains that any dishonesty on her part was simply a coping mechanism and that the evidence did not show that her dishonesty negatively impacted the children. Moreover, she contends that mere dishonesty is not enough to justify the termination of parental rights. In sum, mother asserts that the evidence demonstrates that she is at least a minimally adequate parent who can care for her children and that she has a viable plan and stable housing to facilitate the children's return to her care.

DHS argues that, at the time of trial, mother still suffered from mental health problems that were seriously detrimental to the children. DHS relies heavily on Basham's conclusion in his second psychological evaluation that there is little evidence that mother has benefitted from services, that she has demonstrated greater denial and greater resistance to services than she did during the first evaluation, and that, accordingly, her prospects for parenting have decreased. DHS maintains that mother's antisocial personality traits interfere with her ability to be a safe and appropriate parent and that she has failed to maintain progress toward that end. In particular, DHS points to evidence showing mother's "chronic untruthfulness," which makes her progress difficult to assess.

DHS also notes that, regardless of mother's problems with telling the truth, she is incapable of safely parenting all three children, particularly in light of KJM's significant special needs and the behavioral and psychological challenges facing KJC and KMC. Given the children's special needs, DHS contends that, because of mother's mental health problems and her lack of sustained progress in the 22 months since the juvenile court took jurisdiction, it is unlikely that mother would ever be able to parent the children.

A. *Unfitness*

We note initially that, although the juvenile court purported to "find all of the paragraphs of the petition have been proven," we limit our analysis, as do the parties on appeal, to whether mother's mental health issues were seriously detrimental to the children at the time of trial.[3] To support a finding of unfitness, a mental or emotional illness must render a parent "incapable of providing proper care for the child for extended periods of time." *State ex rel SOSCF v. Mellor*, 181 Or App 468, 477, 47 P3d 19 (2002), *rev den*, 335 Or 217 (2003). A simple diagnosis of mental illness, without more, is not enough; the question is whether "at the time of trial it is highly probable that mother is not presently able, and will not be able within a reasonable time, to meet [the children's] physical and emotional needs." *Id.*

We also give considerable weight to the juvenile court's credibility findings. *A. M. P.*, 212 Or App at 102. Here, the juvenile court found that mother's testimony was not to be believed after determining that mother's lies on the witness stand had destroyed her credibility. We do the same. Accordingly, our inquiry is limited to reviewing the remaining evidence to determine if DHS met its burden.

We begin with an overview of the children's needs. Although the children's special needs vary, the record established that all three need stable and safe homes. KJM, in particular, suffers from severe developmental delays, requires constant individual attention, and needs a consistent routine. Without individualized positive attention, he may need

---

[3] DHS's petition to terminate mother's parental rights asserted several bases for termination, including the use of controlled substances. However, mother's past drug use, without more, is not grounds for termination, and there is not clear and convincing evidence that mother has abused drugs in the two years preceding trial nor is there sufficient evidence that her past drug use continues to be detrimental to the children. *See Stillman*, 333 Or at 145 (past drug problems did not constitute conduct or a condition that rendered a parent unfit at the time of the termination trial); *see also State ex rel Dept. of Human Services v. L. S.*, 211 Or App 221, 241, 154 P3d 148 (2007) (termination of parental rights was not proper where, despite a troubling risk of relapse, the record contained no evidence that the parent used drugs in the year before trial and no evidence that her past drug use had a continuing detrimental effect on the children); *cf. State ex rel Juv. Dept. v. F. W.*, 218 Or App 436, 468-69, 180 P3d 69, *rev den*, 344 Or 670 (2008) (termination of parental rights was proper where the parent's pattern of drug use and relapse had a continuing detrimental effect on the children).

to be institutionalized. KJC has been diagnosed with an adjustment disorder, has difficulty regulating and expressing her emotions, and is behind in her schooling. KMC—while apparently the healthiest of the children—has difficulty regulating her food intake and shows other lingering signs of her unstable early home life. Although she improved quickly both times that she entered foster care, she showed signs of regression after being returned to mother's care for only four months. All three children, to some degree, need a stable home and individual, specialized attention.

We next turn to the evidence regarding mother's progress and mental health issues. The evidence at trial demonstrated that mother generally—although sometimes belatedly—engaged in the services recommended. She consistently visited the children and the visits went well. For the most part, she has complied with the recommendations that resulted from her psychological evaluations. She no longer abuses drugs and she is highly involved in the recovery community.

Nevertheless, despite the positive steps that mother has taken, there is clear and convincing evidence that mother's mental condition negatively affects her ability to meet the children's physical and emotional needs, particularly in light of the special needs of these children. Although Basham was hopeful after his initial evaluation that services would address mother's mental health issues and improve her prospects for parenting, his second evaluation demonstrated a lack of progress that led him to conclude that she cannot safely parent.

Mother's life continues to be marked by instability and failure to follow through, including on matters that directly affect the children. Mother failed to engage KJC in counseling even though KJC had witnessed significant domestic violence and was at risk for future problems. Further, despite the benefit of completing and doing "well" in the parenting classes in the fall of 2009 and despite KJC's educational delays, mother failed to ensure that KJC regularly attended school when she was in mother's care. Mother also failed to complete her own domestic violence counseling and to engage in individual counseling that would treat her

PTSD, a failure that placed the children at risk of harm when she allowed father to have unsupervised contact with them and then instructed them to lie about it.

As of Basham's second evaluation, mother was still exhibiting a lack of insight and increased denial, both barriers to successful parenting because as Basham explained, "awareness and insight of problems is the first step to overcoming them." Notwithstanding treatment and some counseling, mother continued to exhibit antisocial personality traits. As Basham noted, individuals with such traits typically are irresponsible and intolerant of excessive demands and responsibilities, which is a "poor match" for parenting. Evidence of mother's continued irresponsibility and dishonesty is found throughout the record. She routinely missed appointments for counseling and medical care, and she was terminated from St. Vincent de Paul's for missing work. She routinely misrepresented facts and lied about matters concerning the services she was receiving and her progress in complying with those services.

Much of the evidence of mother's progress is undermined to a certain extent by the numerous incidents of dishonesty in the record. Although a parent's untruthfulness alone is not grounds for termination, *State ex rel Dept. of Human Services v. Smith*, 338 Or 58, 85, 106 P3d 627 (2005), if that untruthfulness is seriously detrimental to the children, it can support termination. We agree with DHS that mother's chronic untruthfulness relating to matters directly affecting her receipt of services complicates any assessment of her progress. It is difficult to grant much credence to outside reports of her progress, when those outside perceptions may be tainted by misinformation or manipulation by mother.

In sum, DHS produced clear and convincing evidence that mother's mental condition is a barrier to successful parenting. The record is replete with instances of irresponsibility, dishonesty, and instability that demonstrate mother's inability to provide proper care for the children for extended periods of time. There is little evidence that mother is benefiting from services; in fact, as time went on she demonstrated greater resistance to services. The increase in

denial and her greater resistance to services makes it likely that she will continue to place her needs above those of the children. The evidence established that these children need a safe, stable home that mother cannot provide.

B. *Integration of Children into Mother's Home Within a Reasonable Time*

Mother also contends that DHS failed to demonstrate that integration of the children into her home is unlikely within a reasonable time. In particular, mother asserts that evidence in the record establishes that she is making progress and that her parenting skills were adequate to begin with. Mother also maintains that the state has not demonstrated that the children need permanency or that KJC or KMC have special attachment needs. We disagree. The record demonstrates that mother's mental condition continues to present significant barriers to parenting, and that mother failed to make progress in those areas despite participating in a myriad of services over the 22 months of DHS involvement.

Affirmed.