Argued and submitted September 18, affirmed December 18, 2013, petition for review denied February 28, 2014 (354 Or 837)

In the Matter of S. E. M.-P.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

K. M. M.,
*Appellant.*

Washington County Circuit Court
J110256;
Petition Number M2J110256;
A153861

316 P3d 379

Megan L. Jacquot argued the cause and filed the brief for appellant.

Laura S. Anderson, Senior Assistant Attorney General, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Inge D. Wells, Senior Assistant Attorney General.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Duncan, Judge.

WOLLHEIM, J.

**WOLLHEIM, J.**

Mother appeals from a juvenile court judgment terminating her parental rights to her daughter, S, on the ground of unfitness. ORS 419B.504. First, mother contends that the evidence is not sufficient to show that she was unfit at the time of the proceeding by reason of conduct or condition that was seriously detrimental to S. Second, mother argues that the juvenile court erred in finding that integration of S into mother's home was improbable within a reasonable time. Finally, mother contends that the court erred in determining that termination of parental rights is in the best interest of the child. Based on our *de novo* review, ORS 19.415(3)(a), we find clear and convincing evidence that mother is unfit to parent S and that termination of mother's parental rights is in the child's best interest. Accordingly, we affirm.

## I. FACTUAL BACKGROUND

We begin with a discussion of the facts, as we find them. ORS 19.415(3)(a) (in appeals from a judgment in a proceeding for the termination of parental rights, the Court of Appeals shall review the case *de novo*).

### A. *General Background*

Mother has two children, daughter S and son J, but only S is the subject of this appeal. S was born in 2002 in Nevada and, when she was less than a year old, her father died of a drug overdose. In 2006, mother and S moved to Oregon and began living in an apartment in Beaverton. Problems began when, between January and June 2010, mother made approximately 25 calls to the nonemergency line for the Beaverton Police Department to report break-ins and suspicious activity at her home. She reported that she was "convinced that people were getting into her vehicle, detached garage and apartment to 'mess' with things." She reported, among other things, that people had put "extra stitches in her clothes" and had taken "a single sleeve to a DVD." The police determined that all of mother's reports were unfounded. Based on mother's explanations of what had occurred at her apartment, Officer Wolfe, one of the

responding officers, became concerned about mother's mental health and her ability to care for S.

In June 2010, Wolfe communicated his concerns about mother's mental health to the Washington County Crisis Team (WCCT) and to the Department of Human Services (DHS). The WCCT offered to take mother's future calls about break-ins, so that she would not need to contact the police for nonemergency concerns, and offered her mental health services; mother declined both offers. Later in 2010, mother was contacted by Washington County mental health authorities and DHS. After a home visit, DHS concluded that there would be no safety concerns if mother would participate in a mental health assessment at LifeWorks Northwest (LifeWorks) and engage in mental health treatment. In December 2010, mother completed a mental health assessment at LifeWorks and was diagnosed with delusional disorder. After her assessment, however, mother did not participate in further counseling sessions at LifeWorks.

Problems for mother continued. Mother had unfounded concerns about S's safety. For example, mother believed that S had a skin disorder and, for that reason, could not be exposed to sunlight. Mother also believed that, while she was breastfeeding S, she had given the child herpes. S does not have a skin disorder or herpes. S was aware of mother's beliefs, which made her "very fearful of going out in the sun, because her mother told her that [the] sun * * * is evil" and believed that "nobody would want to play with [her at school], because [she has] herpes." Because mother had general concerns about S's safety while she was at school, mother removed S from school and enrolled her in home school.

In May 2011, when mother was sick and vomiting, S called 9-1-1. In response to S's call, WCCT, along with medical response personnel, came to mother and S's apartment, and WCCT response personnel reported that mother was acting "psychotic" and did not "make a lot of sense" when she was talking. Based on their observations, the response personnel were concerned that S, who was eight years old, was acting as mother's caregiver. The next day, WCCT followed

up with mother and recommended that she participate in mental health counseling; mother again refused further mental health treatment. WCCT then reported to DHS its concerns about mother's mental health.

On May 17, 2011, DHS caseworkers Moore and Shelton visited mother's home in response to WCCT's report. During that visit, Moore explained that mother needed to follow through with the mental health services as previously recommended. In response, mother denied needing mental health treatment and explained that she was only required to participate in a mental health intake assessment at LifeWorks, which she already had completed. Mother expressed a reluctance to participate in any additional mental health treatment. On that day, Moore took S into protective custody based on "concerns [mother] has not addressed her mental health or followed through with service." As previously mentioned, S was eight years old at the time.

DHS filed a petition with the juvenile court, alleging, among other things, the following:

> "The conditions and circumstances endanger the welfare of said child by reason of the following facts:

> "A. The mother's mental health, which includes delusional disorder, interferes with her ability to competently care for said child. Said child has been responsible for providing care to mother due to mother's severe mental health."

Soon after she began representing mother, mother's counsel had concerns about mother's ability to understand the dependency proceeding and requested that a psychological evaluation of mother be conducted. In May 2011, Dr. Scharf, a clinical psychologist, evaluated mother and determined that she "was unable to demonstrate an understanding of the current legal proceeding against her" and that when "she was being assessed about her knowledge of the court proceedings, she was rambling and delusional." He ultimately recommended that a guardian *ad litem* be appointed to assist mother, and the juvenile court appointed a guardian in June 2011.

The guardian *ad litem* admitted the allegations in DHS's petition and, based on those admissions, the juvenile court took jurisdiction over S in July 2011. The parties entered into an action agreement that required that mother "continue to comply with and actively participate in her treatment plan as outlined by LifeWorks NW. This includes but is not limited to medication management."

B.  *Termination Trial*

In February 2013, DHS petitioned for termination of parental rights because, as pertinent here,

"mother is unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into mother's home is improbable within a reasonable time due to conduct or conditions not likely to change, including, but not limited to the following:

"* * * * *

"d)   An emotional illness, mental illness or mental deficiency of such nature and duration as to render the parent incapable of providing care for extended periods of time."

In its petition, DHS stated that "[i]t is in the child's best interest to be freed for adoption and be provided with the security of a permanent home." At the time of trial, S had been in foster care for 21 months. DHS selected S's paternal grandparents, who live in Texas, as her adoptive placement.[1]

At trial, Sharma, the assigned DHS caseworker, testified as to some of the services that DHS had provided to help mother. She explained that DHS's focus was to supplement the mental health counseling that mother had been receiving at LifeWorks since DHS had assumed custody over S. Sharma stated that DHS had arranged for mother to participate in psychological evaluations with Scharf; facilitated a psychiatric medication evaluation of mother with Boyd, a psychiatrist at LifeWorks; made efforts to maintain mother's continued participation in her therapy sessions at LifeWorks; and made efforts to motivate mother to take her recommended medication.

---

[1] The parties acknowledged that, before trial, S's paternal grandparents had offered mother a post-adoption contact agreement, which states that the grandparents would facilitate and promote safe visitations with mother.

Sharma also explained her efforts to find housing for mother after mother was evicted from her apartment and was living in her car. Sharma worked with Sokal, mother's primary counselor at LifeWorks, to find her housing at a shelter; however, mother originally rejected any housing options that would require her to "admit to a mental health illness." Sharma explained that mother eventually accepted housing vouchers, which require her to continue counseling with LifeWorks, and planned to move to subsidized housing after trial, in March 2013. At the time of the termination trial, mother had been living in and out of motels.

There was expert evidence regarding S's and mother's mental health, including Scharf's reports. Scharf's first evaluation of mother, in May 2011, addressed whether a guardian *ad litem* should be appointed for her. Scharf determined that mother was unable to understand her current legal situation and was delusional. His second evaluation, in July 2011, assessed mother's mental health and her ability to parent. In that evaluation, Scharf noted that mother remained delusional and had problems redirecting her conversations. He ultimately diagnosed mother with schizophrenia, disorganized type, explaining that her "illogical thinking and rambling speech is more consistent with Disorganized Schizophrenia" than delusional disorder, which was her previous diagnosis by her therapist at LifeWorks. Scharf determined that mother's "psychological status most likely would significantly have a negative impact on her parenting and have a negative impact on her daughter's psychological well-being." He explained that mother "is in need of antipsychotic medication to help her control her Schizophrenia. Counseling alone will not adequately address her condition." However, Scharf stated that mother is refusing to "take psychiatric medication and [mother] does not believe there is anything wrong with her." Scharf recommended that, before S could be returned to her care, mother would need to consistently take medication for four to six months and it would be helpful for her "to agree to take any antipsychotic medication through shot form to ensure her compliance with medications."

Scharf testified at trial that it is common for people with schizophrenia to refuse to take medication and

restated that the only treatment that would help mother would be antipsychotic medication. Scharf also opined that, even though mother had previously been pressured by DHS, LifeWorks, and others to take medication and follow her treatment plan, mother's refusal to take medication was not going to change. Scharf believed that if mother's schizophrenia remained untreated, mother's mental health issues would have a huge impact on her parenting and would be detrimental to S. Scharf explained that, due to her schizophrenia, mother's inability to reason would result in S having poor problem-solving skills and anxiety issues. He explained that S would have anxiety issues that would be detrimental to her, "especially with this situation, where[] * * * the child's bombarded by the idea that people are breaking into her home, that [she's] not safe, * * * [and that she has] herpes." Scharf was concerned that S would be at risk of emotional neglect if placed in mother's care because mother lacks an understanding of S's emotional needs.

DHS also provided the juvenile court with medical progress notes from LifeWorks by Boyd and Sokal. In those notes, Boyd explained that mother was diagnosed with schizophrenia, disorganized type, and prescribed medication to "help her thinking, as she seems to derail and have paranoid thoughts." Boyd explained that mother declined to take medication, believing that it was unsafe for her to take it while she was pregnant with her son J. Sokal also explained that, after mother had a psychiatric medication evaluation with Boyd, mother refused to take the medication because she believed it to be unsafe.

DHS also provided evidence about S's mental health. Sharma testified that she did not believe that mother was able to provide "safe and stable" care for S and that S would suffer serious detriment if she were returned to mother's care. Sharma explained that when S was taken into DHS's custody, she was "very parentified" and "taking on a very strong caregiving role that continues, and continues to persist in her life[.]" Sharma stated that as long as mother refused to follow the recommendation to take antipsychotic medication, there would be no change in her mental health in the future.

In June 2011, S had a mental health evaluation. S was diagnosed with adjustment disorder, unspecified, and participated in biweekly counseling sessions, which were discontinued in October 2011 because her therapist believed that S was doing well. S was also evaluated by Dr. MacPhail, a psychologist at the Children's Program, a diagnostic and treatment clinic. MacPhail noted that, although S was doing well in her foster home, S's "foster mother and caseworker report[ed] some concerning behaviors, including fears and worries related to her birth mother and upcoming transition to adoption." For that reason, MacPhail diagnosed S with an adjustment disorder, unspecified, to reflect the possibility that "the numerous changes and stressors in [S's] life * * * are moderately affecting her overall social-emotional functioning." In that evaluation, MacPhail recommended that S be monitored on an ongoing basis through continued participation in mental health therapy.

MacPhail testified at trial about S's mental health. MacPhail stated that S had become more anxious in recent months, given that there were some transitions about to happen with her placement, and S was displaying concern about mother's welfare. MacPhail commented on the importance of permanency for S, stating that "it's very important [that she] not be in a holding pattern for a long period of time, because * * * it creates a tremendous amount of anxiety [for her] about what lies ahead." MacPhail testified that, if S remained in foster care for a period of time, then there would be a risk that she would continue to have anxiety issues. She concluded that it would be beneficial for S to have permanency established as soon as possible.

Since July 2012, S had participated in counseling with Smith-Hohnstein, a therapist at Kinship House, a nonprofit mental health agency that specializes in working with children in foster care. In her session notes, Smith-Hohnstein reported, "[S] stated that she loved her mother, but did not want to live with her[.]" Smith-Hohnstein explained that she is concerned about how S "sets aside her own needs, her own emotional needs, in an attempt to care for and take care of other people," which is a result of her experience with needing to take care of mother. With regard to S's adoption, Smith-Hohnstein reported that S was comfortable with

being adopted by her paternal grandparents, but was having anxiety about when it would happen. Smith-Hohnstein believed that delaying permanency for S would be detrimental to her because it would affect S's ability to form age-appropriate relationships with others. At the time of trial, S was 10 years old and had been in foster care for 21 months.

Mother also testified at trial. Mother acknowledged that, in order to have S returned to her, she was required to have a safe and stable living situation. She testified that she had located a new apartment and had acquired housing vouchers to cover 70 percent of the cost of the rent. Mother testified that she had acquired a steady income by delivering construction supplies and working part-time for a flooring company doing clean up. Mother also stated that she is receiving Social Security benefits,[2] nutrition assistance, and had an honored citizen's pass for public transportation from DHS. However, when asked about her mental health issues, mother repeatedly disputed her diagnosis and stated that she would not take medication.

The juvenile court terminated mother's parental rights. In its judgment, the juvenile court found, by clear and convincing evidence, that

"mother is unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into mother's home is improbable within a reasonable time due to conduct or conditions not likely to change, including the following:

"* * * * *

"e) An emotional illness, mental illness, or mental deficiency * * *."

In its findings, the court stated that

"because of mother's untreated mental illness and refusal to participate in medication treatment, under the totality of the circumstances, the child cannot safely be returned to her within a reasonable period of time. Moreover, child's continued placement in non relative foster care would be

---

[2] Mother's guardian *ad litem* assisted her in obtaining Social Security disability benefits, even though mother insisted that she did not have a mental illness.

seriously detrimental to the child's emotional and psychological welfare. Consequently, because a relative adoptive placement is welcomed by the child and willing to facilitate and promote safe visitations with mother, adoption is in the child's best interest."

## II.  ANALYSIS

On appeal, mother raises three assignments of error. First, mother contends that the court erred in finding that mother was unfit at the time of the proceeding by reason of conduct or condition that was seriously detrimental to the child. Second, mother argues that the court erred in determining that integration of the child into mother's home was improbable within a reasonable time. Third, mother contends that the court erred in determining that termination of parental rights was in the best interest of the child.

On *de novo* review, we must determine, by clear and convincing evidence, whether to terminate mother's parental rights with respect to S under ORS 419B.504, which provides, in part:

"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child or ward and integration of the child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change."

That statute poses a two-part test for the court to address. *See State ex rel SOSCF v. Stillman*, 333 Or 135, 145, 36 P3d 490 (2001). First, we address mother's unfitness, which, in turn, requires a two-part inquiry: (1) whether mother "has engaged in some conduct or is characterized by some condition"; and (2) whether "the conduct or condition is 'seriously detrimental' to" S. *Id.* Second, if mother is unfit, we must determine whether it is improbable that S can be integrated into mother's home within a reasonable time because the conduct or condition is unlikely to change. *Id.* Evidence of a parent's unfitness is clear and convincing "if it makes the existence of a fact highly probable or if it is of extraordinary persuasiveness." *State ex rel Dept. of Human Services*

*v. A. M. P.*, 212 Or App 94, 104, 157 P3d 283 (2007) (internal quotation marks omitted). If that standard is satisfied, "it remains to be decided whether termination is in the child's best interests." *State ex rel SOSCF v. Hammons*, 170 Or App 287, 297, 12 P3d 983 (2000), *rev den*, 331 Or 583 (2001); ORS 419B.500.

A.  *Unfitness of Mother*

We begin with mother's first and second assignments related to the juvenile court's determination that she was unfit at the time of the proceeding. Although the juvenile court determined that DHS had proved other allegations of unfitness in the petition for termination, because we find it dispositive, we limit our analysis to whether the court erred in determining that mother's mental health condition rendered her incapable of providing care for S.

A parent's fitness "is measured at the time of the termination trial, and the focus of the test is on the detrimental effect of the parent's conduct or condition on the child, not just the seriousness of the parent's conduct or condition in the abstract." *Dept. of Human Services v. C. M. M.*, 250 Or App 67, 75, 279 P3d 306, *rev den*, 352 Or 341 (2012) (citations and internal quotation marks omitted). To support a finding of unfitness, "a mental or emotional illness must render a parent 'incapable of providing proper care for the child for extended periods of time.'" *Dept. of Human Services v. C. L. C.*, 247 Or App 445, 463, 268 P3d 808 (2011) (quoting *State ex rel SOSCF v. Mellor*, 181 Or App 468, 477, 47 P3d 19 (2002), *rev den*, 335 Or 217 (2003)). Consequently, a diagnosis of mental illness, by itself, is not enough to support a finding of unfitness; instead, "the question is whether at the time of trial it is highly probable that mother is not presently able, and will not be able within a reasonable time, to meet [the child's] physical and emotional needs." *Id.* (internal quotation marks omitted).

On appeal, the parties do not dispute that mother is "characterized by some condition," *i.e.*, schizophrenia. We therefore turn to the second part of the two-part inquiry of unfitness—whether mother's mental health condition was

seriously detrimental to S. To determine whether mother's schizophrenia was detrimental to S, we begin by discussing S's needs. *See State ex rel Juv. Dept. v. F. W.*, 218 Or App 436, 456, 180 P3d 69, *rev den*, 344 Or 670 (2008) ("The inquiry of whether a parent's conduct or condition has had a seriously detrimental effect on the child is meant to be child-specific and calls for testimony in psychological and developmental terms regarding the particular child's requirements." (Internal quotation marks omitted.)). The record establishes that S has been diagnosed with an adjustment disorder. Additionally, and more significantly, Sharma reported that, as a result of having to take care of mother, S was "parentified." MacPhail reported that, although she was doing well in foster care, S had anxiety issues related to mother and the numerous changes in S's life that affected her "overall social-emotional functioning."

Although mother made improvements in addressing her mental health issues by attending counseling sessions consistently, we conclude that there is clear and convincing evidence that mother's schizophrenia, left untreated, has a detrimental impact on S. Sharma believed that mother was unable to provide "safe and stable care" for S because mother's delusions would make S fall into a "caregiving role" and "feel like she has to take care of her mother." Smith-Hohnstein explained that one of her concerns for S was that "she sets aside her * * * own emotional needs, in an attempt to care for and take care of other people," which is a result of her experience with needing to take care of mother. Scharf testified that untreated schizophrenia would have an impact on S because it would cause her to have some anxiety and fearfulness, especially while being bombarded by delusions from her mother that people are breaking into her home, that she is not safe in her home, and that she has herpes. Scharf also concluded that S "would develop significant mental health problems if she stayed in the custody of her mother, * * * without her getting treatment," and that S would be at risk of emotional neglect if placed in mother's care. Accordingly, the record demonstrates, by clear and convincing evidence, that mother's untreated schizophrenia is harmful to S and mother is unable to provide proper care for S.

We next address whether there is clear and convincing evidence to support a finding that integration of S into mother's home is unlikely within a reasonable period of time. ORS 419B.504. A "reasonable time" is defined as a "period of time that is reasonable given a child or ward's emotional and developmental needs and ability to form and maintain lasting attachments." ORS 419A.004(20); *Mellor*, 181 Or App at 492. The relevant issue in this case is whether mother's mental health issues would improve within a reasonable time.

Mother acknowledges that in the past she has refused to take antipsychotic medication to treat her schizophrenia. Mother argues, however, that, because she recently accepted housing vouchers, which require her to acknowledge her mental health condition and maintain mental health treatment, it is reasonable for the court to "wait and see" if she would also accept medication management so that S could be returned to her care within a reasonable time.

We conclude that there is clear and convincing evidence that mother's mental health issues would not improve so as to allow S to be integrated into mother's home within a reasonable period of time. Mother has had mental health counseling with LifeWorks since S was removed to DHS's custody. Despite mother's continuous counseling, she has repeatedly refused to acknowledge her mental health issues. In his evaluation and his testimony at trial, Scharf explained that mother's schizophrenia would improve only with antipsychotic medication and that counseling alone will not adequately address her condition. Scharf noted, however, that mother believed that she did not have a mental health problem and refused to take her recommended medication. Because mother refused to take medication, he recommended that she participate in monitored medication treatment for at least four to six months.

LifeWorks and DHS also tried to motivate mother to take medication to treat her schizophrenia. Boyd at LifeWorks recommended that she take medication and explained that it would be safe to take even while she was pregnant with her son, J. Sokal and Sharma also tried to

motivate mother to take her recommended medication. Scharf opined that, even though mother received pressure from DHS, LifeWorks, and others to take medications and follow her treatment plan, mother's refusal to take medication was not going to change. Even at trial, mother consistently stated that she did not believe that taking the recommended medication would benefit her and there was no indication at trial that she would participate in the monitored medication treatment that Scharf had recommended.

In sum, mother's mental illness is seriously detrimental to S and, because mother continues to refuse to take medication, her condition is unlikely to change so as to allow S to be integrated into mother's home within a reasonable time. Accordingly, we conclude that mother is unfit to parent S.

B.  *Best Interest of the Child*

We now turn to mother's third assignment, related to whether termination of mother's parental rights is in S's best interest. ORS 419B.500. "Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time so as to provide a [wholesome and healthful] environment," free from fear of abuse, injury, or neglect, "the best interests of the child(ren) generally will require termination of that parent's parental rights." *State ex rel Juv. Dept. v. Geist*, 310 Or 176, 189, 796 P2d 1193 (1990). We conclude that it is in S's best interest to terminate mother's parental rights. Although mother loves her child, the record supports that S now needs permanency and stability. At the time of trial, S had been in foster care for 21 months and expressed that she is ready to live permanently with her adoptive family, her paternal grandparents. MacPhail recommended that permanency for S be achieved as soon as possible, and Smith-Hohnstein testified that any delay in permanency would affect S's ability to form age-appropriate relationships with others. (Moreover, the record indicates that a post-adoption agreement will allow S to remain in contact with mother. *See C. M. M.*, 250 Or App at 79 (in concluding that it was in the child's best interest to terminate the mother's parental rights, the court noted that the child was bonded to his adoptive family and, "if adopted, would

remain in touch with his extended family").) Given S's need for permanency and stability, we conclude that it is in the child's best interest to terminate mother's parental rights.

Affirmed.